CRESCENT OIL AND SHIPPING SERVICES, LTD., Plaintiff–Appellant,

v.

PHIBRO ENERGY, INC., and Salomon Inc., Defendants–Appellees.

No. 653, Docket 90–7694.

United States Court of Appeals, Second Circuit.

Argued Nov. 29, 1990.

Decided Feb. 28, 1991.

George F. Chandler, III, New York City (Hill, Rivkins, Loesberg, O'Brien, Mulroy & Hayden, New York City, Anthony J. Mavronicolas, of counsel), for plaintiff-appellant.

Laurence A. Silverman, New York City (Cahill Gordon & Reindel, New York City, Steven Lieberman and Christopher Nelson, of counsel), for defendants-appellees.

Before OAKES, Chief Judge, LUMBARD and CARDAMONE, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiff, Crescent Oil and Shipping Services, Ltd. appeals from the July 9, 1990 order of the Southern District of New York, Lowe, *Judge*, granting summary judgment to defendants, Phibro Energy, Inc., and its parent corporation, Salomon Inc., and denying Crescent's cross-motion for summary judgment. We affirm.

This case arises out of the interpretation of the pricing terms of a contract for the sale of oil. The material facts are undisputed. In November 1987, Crescent contacted First National Crude Oil Brokers to assist Crescent in the sale of Malongo crude oil from Angola. First National identified Phibro as a potential buyer, and began negotiations with Phibro's oil traders, on Crescent's behalf. These negotiations culminated in an agreement whereby Phibro agreed to purchase approximately 120,000 metric tons of oil to be delivered at Crescent's expense on a tanker, the *Petrol de Oro*, chartered by Crescent. On November 18, First National confirmed the terms of the contract by telex (Broker's Confirmation).[1]

The Broker's Confirmation provided that the price would be based upon the average

---

**1.** Crescent also sent a telex to Phibro on November 19 setting forth the terms of the contract. Phibro responded to Crescent's telex with its own contract telex on November 24. The terms of all three telexes were substantially identical, except as set forth below.

price per barrel of oil futures trading on the New York Mercantile Exchange at the time of the tender of a Notice of Readiness ("NOR") by the *Petrol de Oro*'s master at the "discharge port." Specifically, the pricing term of the Broker's Confirmation states:

> Delivered price per net U.S. barrel based on outturn quantity/quality ... in accordance with the average of the WTI [2] settlement prices on the New York Mercantile Exchange for January [3] (or if in the unlikely event at the date of NOR, January is off the board, then other applicable front month), one day before NOR, NOR date, and one day after NOR at discharge port.[4]

The Broker's Confirmation also contained a separate "Lighterage" [5] provision stating that Phibro would pay for any necessary lighterage.

In its November 24 telex, Phibro exercised its contractual right by notifying Crescent that Texas City, Texas would be the discharge port. On the same day, Crescent confirmed this designation in a telex to Phibro.

On December 8, Phibro telexed Crescent its request that the *Petrol de Oro* proceed to the Galveston Lighterage Area to offload some of its oil.[6] The Lighterage Area is an open sea location in the Gulf of Mexico more than fifty miles off Galveston, Texas. On December 14, at 8:30 p.m., the *Petrol de Oro* arrived at the Galveston Lighterage Area and tendered an NOR.

Because the tanker was not scheduled to arrive until December 16, lighterage operations were not commenced until that day; they were completed on December 17.[7] The *Petrol de Oro* reached Texas City, the discharge port, on the 17th, and its master tendered a second NOR at the request of Phibro.

Because the contract price of the oil was based on the date of tender of the NOR at discharge port and because the price of WTI dropped significantly between the 14th and 17th of December, the fact that there were two NORs tendered for this crude oil is significant. Claiming that the second NOR, tendered at Texas City, was the one contemplated by the contract, Phibro paid Crescent based on the price of WTI on the 16th, 17th and 18th of December 1987.

Asserting diversity jurisdiction,[8] Crescent brought suit against Phibro contending that the first NOR was effective, and that Phibro was obligated to pay the price of WTI on the 11th, 14th and 15th of December, which was $1,400,000 more than the price of WTI calculated on the basis of the second NOR. Upon cross-motions for summary judgment, the district court held that the date of the second NOR determined the price, and granted Phibro's motion for summary judgment. The district court found the contract to be "clear and unambiguous" on its face, and did not consider extrinsic evidence of the course of dealing and usage of trade submitted by Crescent in its motion for summary judg-

**2.** "WTI" is West Texas Intermediate, a grade of crude oil on which futures are publicly traded and prices quoted on the New York Mercantile Exchange.

**3.** January is an expiration month for futures contracts traded on the New York Mercantile Exchange. It is the settlement prices of these contracts trading on the Mercantile Exchange that formed the basis for the price in the parties' contract.

**4.** The "discharge port" is the port at which Crescent was to deliver the oil. This port was to be designated by Phibro.

**5.** Lighterage refers to the process of off-loading a portion of one vessel's cargo onto another vessel prior to entering a port. This allows the first vessel (which, if fully loaded, rides too low

in the water) literally to ride lighter in the water, and travel safely into port.

**6.** When fully loaded, the draft of the *Petrol de Oro* was fifty one feet, too deep to permit entry into the port of Texas City, which has a draft limit of forty feet.

**7.** At appellate oral argument, Crescent represented that nearly forty percent of the *Petrol de Oro*'s Malongo cargo was lightered.

**8.** 28 U.S.C. § 1332 (1982). Crescent is incorporated in Liberia and has its principal place of business in Switzerland, Phibro is incorporated in Delaware and has its principal place of business in Connecticut, and Salomon is incorporated in Delaware and its principal place of business is in New York.

ment. We affirm the judgment of the district court on the ground that the extrinsic evidence proffered by Crescent, which we believe should have been considered, failed to establish that the parties intended that an NOR tendered at lighterage would determine the price of the Malongo shipment.

## I.

■ Because this court is sitting in diversity jurisdiction and the lawsuit was brought in the Southern District of New York, New York choice of law principles govern. See *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York courts, in construing contracts, would apply the law of the jurisdiction having the greatest interest in the litigation.[9] See *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda), Ltd.*, 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168 (1975); *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E.2d 576 (1969). Having considered the interests at stake, we conclude that Connecticut law should apply. Phibro's principal place of business, and that of its trader and broker and First National, Crescent's broker, are in Connecticut. The deal was negotiated in Connecticut by the parties' brokers. Despite the fact that the contract was to be performed by Crescent's delivery of the oil in Texas, Connecticut's concern in the transaction is paramount because of its interest in regulating business conducted there.

## II.

■ The district court held that the maritime custom and usage evidence explaining "discharge port" submitted by Crescent supporting its motion for summary judgment was irrelevant because the contractual language was "clear and unambiguous". We disagree. The meaning of "discharge port" is not so clear as to preclude consideration of explanatory evidence.

The oil contract is governed by the Uniform Commercial Code because it is an agreement for the sale of goods. See Conn.Gen.Stat.Ann. § 42a–2–102 (West 1960). Although extrinsic evidence may not be used to vary or contradict the express terms of a writing embodying the parties' final agreement,[10] evidence of the course of dealing and performance and usage of trade may be employed to explain or supplement provisions of the contract. See Conn.Gen.Stat.Ann. § 42a–2–202 (West 1964); *Fairfield Lease Corp. v. Eastern Sportswear Co.*, 6 Conn.Cir. 347, 273 A.2d 300 (1970) (parol testimony may be received in connection with a written contract to enable the court to understand meaning of words parties have used, but not to vary or contradict them). The commentary to § 42a–2–202 rejects "(t)he premise that the language used has the meaning attributable to such language by rules of construction existing in the law rather than the meaning which arises out of the commercial context in which it is used." Comment 1(b). Crescent submitted course of performance and usage of trade evidence in an attempt to show that "discharge port" included the lightering area associated with that port. Thus, Crescent was not trying to contravene the plain meaning of the contract, rather it was trying to explain a phrase which is rationally susceptible to differing interpretations.[11] As a result, the

---

9. In the confirmatory telexes between the parties, Phibro requested that Texas law apply to contractual construction issues in court, while Crescent requested that English law apply. Because there was no assent to either parties' choice of law, New York courts would not give effect to either request. *Cf.* N.Y.U.C.C. Law § 1–105 (McKinney Supp.1990) (giving effect to an *agreement* between the parties as to the choice of law governing a U.C.C. contract) (emphasis added); New York Jurisprudence 2d, § 33, at 608–09 (1982) (parties' choice of law selection generally enforced if it can be ascertained).

10. Crescent confirmed the Broker's Confirmation with a *telex* which stated that the "contract contains the entire agreement of both parties and cannot be modified unless in writing."

11. Corbin wrote:

There are, indeed, a good many cases holding that the words of a writing are too 'plain and clear' to justify the admission of parol evidence as to their interpretation. In other cases, it is said that such testimony is admissible only when the words of the writing are themselves 'ambiguous'. Such statements as-

district court should have considered this parol evidence in its Fed.R.Civ.P. 56 disposition of this case.

■ Nevertheless, the parol evidence proffered by Crescent does not support its contention that the NOR given at the lighterage area was the relevant NOR under the pricing provision. To survive Phibro's motion for summary judgment, Crescent had the burden of producing evidence of usage of trade or course of performance between the two parties that would show an intent by the parties to give effect to the NOR tendered at the Galveston Lighterage Area. *See e.g.* Conn.Gen.Stat. Ann.Law § 42a-1-205(2) ("The existence and scope of such [a usage of trade] are to be proved as facts."). However, the evidence submitted by Crescent does not raise a genuine issue of fact as to whether the parties intended "discharge port" to include the Galveston Lighterage Area.

Crescent first claims that Phibro's December 7 telex, which designated Texas City as the discharge port, "extended" the port to the Galveston Lighterage Area. However, Phibro's telex merely directed the *Petrol de Oro* to lighter at Galveston before discharging the remainder of the Malongo cargo in Texas City. This telex cannot be construed as a manifestation of intent by Phibro to include the Lighterage Area as part of the discharge port.

Crescent also asserts that, according to the deposition of two Crescent employees, Phibro assured Crescent that it would be a one-port discharge. This evidence is inapposite to the issue of what the parties intended by "discharge port". Further, the testimony of Crescent's employees regarding the assurances of Phibro does not constitute course of dealing or performance evidence, nor does it involve usage of trade as required by § 42a-2-202(a). The testimony is simply parol evidence subject to the more stringent mandate of § 42a-2-202(b), which permits supplemental evidence of consistent terms only if the court does not find that the writing was integrated. In this case, the confirmation telex by Crescent expressly stated that the telex contained the entire agreement of the parties. As the contract was integrated, extrinsic evidence other than evidence of the course of dealing or performance, and usage of trade, should not be considered.

Crescent argues that Phibro's own chartering department relied upon the NOR of December 14th (but not the one for the 17th) to calculate demurrage.[12] However, the contractual provision for demurrage was independent of the pricing provision. There has never been any dispute in this litigation over the validity of the first NOR with regard to demurrage. The demurrage term is not in the series of telexes which constitute the contract, but rather it is contained in the Charter Party. The Charter Party is a separate agreement between the owner of the *Petrol de Oro* and Crescent's affiliated company, Actangol Chartering Ltd. The Broker's Confirmation calls for demurrage to be calculated "in accordance with the Charter Party rate." Demurrage was calculated with reference to the Charter Party rate, which stated that demurrage was to commence at lighterage. Thus, it was proper for the NOR at the Galveston Lighterage Area to be given effect for demurrage purposes, but those purposes are not material to the contract's pricing terms. The other extrinsic evidence submitted by Crescent raises no genuine issue of material fact as to the parties' intent regarding the pricing term.

■ Alternatively, Crescent argues that the lower court should have held that the geographical limits of the "discharge port" extended to the Galveston Lighterage Area. We disagree.

The lighterage area and the discharge port are not treated synonymously in the contract. Only laytime and demurrage were to be calculated at the lighterage

---

sume a uniformity and certainty in the meaning of language that do not in fact exist; they *should be subjected to constant attack and* disapproval.
*Corbin on Contracts* § 542 at 108–110 (1960).

**12.** The owner or charterer of a vessel often charges a demurrage fee for the amount of *time, beyond that agreed upon, that the vessel is* delayed in discharging or lightering its cargo.

area. There is no indication in the contract that the two locations were to be treated as one "discharge port" for purposes of determining price. Further, the Lighterage Area is fifty miles off Galveston. It serves other ports in Galveston Bay, such as Houston, in addition to Texas City. The Lighterage area could just as readily be associated with ports other than Texas City. Thus, Texas City and the Galveston Lighterage Area are distinct locations, which were not treated as one under the contract.

We have considered Crescent's other arguments and find they do not merit discussion.

We affirm the summary judgment in favor of Phibro.

OAKES, Chief Judge, dissenting:

"Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118, 33 S.Ct. 967, 972, 57 L.Ed. 1410 (1913); *see also* 4 Williston on Contracts § 623, at 789–90 (3d ed. 1961). Connecticut law, which governs the instant contract, has long recognized this principle of contract construction. *See, e.g., Ruscito v. F–Dyne Elecs. Co.*, 177 Conn. 149, 170, 411 A.2d 1371, 1381 (1979); *Beach v. Beach,* 141 Conn. 583, 591, 107 A.2d 629, 633 (1954) (parties' conduct is "strong presumptive evidence" of contract's meaning).

A practical construction of the contract in this case indicates that Galveston Lighterage Area and Texas City were both "discharge ports" (or "disports") within the meaning of the contract.[1] Specifically, Galveston Lighterage Area was the discharge port for the approximately 316,000 barrels of lightered oil, while Texas City was the discharge port for the balance of the oil (approximately 515,000 barrels). I base my

conclusion on the parties' statements and conduct during the course of performance, viewed as a whole. In particular, I note the following:

* In a telex dated November 24, 1987, Crescent informed Phibro that it "ha[d] advised [the] owners of [the] *final* discharge port [was] Texas City" (emphasis added). Use of the qualifier "final" suggests that Crescent considered that there would be another, non-final discharge port, *i.e.*, the lightering area.

* Similarly, in a telex of December 7, 1987, Phibro requested Crescent to inform the *Petrol de Oro* that, after lighterage, the vessel was to proceed to Texas City "for *completion* of discharge" (emphasis added), thus suggesting that discharge would *commence* at an earlier point, *i.e.*, the lighterage area.

* The contract provides for a "mutually agreed independent inspector" to determine the quantity and quality of the cargo "at disport." At Phibro's instruction, an inspection was performed not only at Texas City, but also at the lighterage area.

* The contract provides for title and risk of loss to pass to Phibro "when product reaches vessel's flange connection at discharge port." In fact, the cargo bound for Corpus Christi passed the *Petrol de Oro*'s flange at the lighterage area.

Where, as here, a contractual provision is fairly susceptible to more than one interpretation, Connecticut law prefers the interpretation that is most reasonable and equitable. *See, e.g., Lanna v. Greene*, 175 Conn. 453, 458–59, 399 A.2d 837, 841 (1978); *Texaco, Inc. v. Rogow*, 150 Conn. 401, 408, 190 A.2d 48, 52 (1963). Under my practical interpretation, the term "discharge port" means precisely "port where the cargo is discharged." Under Phibro's interpretation, which my colleagues adopt, the term may have little functional relevance, as the pricing term would be set by the NOR at Texas City—the designated disport—even if one-hundred percent of the oil were dis-

---

1. In concluding that there were, in effect, two discharge ports, I am cognizant of the fact that the contract refers to only a single "discharge port." However, it is equally true that the con-

tract contemplates only a single NOR. Given that there were indisputably two NORs, it does not seem unreasonable to conclude that there were also two discharge ports.

charged at Galveston and transported to Corpus Christi or elsewhere. It is, I believe, more reasonable and equitable that the pricing mechanism be triggered by a meaningful event, such as the delivery of the oil to the exclusive control of the buyer. In the case of the lightered oil, Phibro effectively took control at Galveston, where its agent, Jahre Shipping, took delivery.[2] Phibro assumed title and the risk of loss of the lightered oil from the time of lightering, and it seems fair to conclude that Phibro should also have assumed the risk of price fluctuation at that time.

If there were, as I have argued, two discharge ports, then the December 14 NOR (at Galveston Lighterage Area) should control the pricing term for the lightered oil, while the December 17 NOR (at the Texas City pilot station) should control the pricing term for only that portion of the oil actually delivered to Texas City. Accordingly, I would reverse the grant of summary judgment for Phibro, and remand with instructions to recalculate the price of the Galveston and Texas City oil based on separate pricing schedules.

---

**2.** That Phibro had full control over the lightered oil is most clearly demonstrated by the fact that Crescent was not even aware that this oil was transported to Corpus Christi until well after the fact.