LION OIL TRADING &
TRANSPORTATION,
INC., Plaintiff,

v.

STATOIL MARKETING AND
TRADING (US) INC.,
Defendant.

Statoil Marketing and Trading
(US) Inc., Plaintiff,

v.

Lion Oil Company, Defendant.

Nos. 08 Civ. 11315(WHP),
09 Civ.2081(WHP).

United States District Court,
S.D. New York.

Aug. 3, 2010.

Mark R. Robeck, Esq., Baker Botts, L.L.P., Houston, TX, for Lion Oil Trading & Transportation, Inc.

David Peter Langlois, Esq., Sutherland Asbil & Brennan, LLP, New York, NY, for Statoil Marketing & Trading (US), Inc.

*MEMORANDUM & ORDER*

WILLIAM H. PAULEY III, District Judge:

Lion Oil Trading & Transportation, Inc. ("LOTT") and Statoil Marketing and Trading (US) Inc. ("Statoil") bring dueling ac-

tions alleging reciprocal breaches of an oil exchange contract. These actions were consolidated. This dispute arises from delivery delays occasioned by consecutive hurricanes in the Gulf of Mexico. LOTT moves for a declaratory judgment that the contract price for certain shipments of oil should be determined by the actual month, as opposed to the intended month, of the oil's delivery. For the following reasons, LOTT's motion for a declaratory judgment is denied.

## BACKGROUND

In July 2007, LOTT and Statoil entered into a one-year "buy-sell" or "exchange" contract (the "Contract") for the purchase and sale of crude oil. (Joint Stipulation of Facts pursuant to Local Civil Rule 56.1 dated Nov. 10, 2009 ("Joint 56.1 Stmt.") ¶ 1; Declaration of Mark R. Robeck dated Feb. 19, 2010 ("Robeck Decl.") Ex. 3: Confirmation Letter from Statoil Marketing and Trading to LOTT Trading & Transportation dated May 2, 2008 ("Contract") at * 1.) On May 2, 2008, the parties executed a six-month contract extension running from July through December 2008. (Joint 56.1 Stmt. ¶ 1.) Under the Contract, each party agreed to buy crude oil of one grade and simultaneously sell an equal volume of crude of a different grade to the other party. (Joint 56.1 Stmt. ¶¶ 2–11.)

Part I of the Contract provides that LOTT would sell and Statoil would buy 5,000 barrels per day of Domestic Sweet Crude Oil (West Texas Intermediate Quality) ("WTI"). (Joint 56.1 Stmt. ¶¶ 2–3.) The price per WTI barrel was calculated using the following formula:

> The arithmetic average (rounded to three decimal places) of the mid-points of Argus' spot crude price assessments for Domestic Sweet Crude Oil (17:00 Houston Cash) as reported in Argus America's Crude Report for the prompt (i.e., nearest future) delivery month being reported each Argus' business day for the calendar month of delivery (e.g., for barrels delivered in July, 2008 Buyer pays the average reported price for July, 2008 as reported from the 26th of the month two months prior to delivery through the 25th of the month prior to delivery, inclusive).

(Contract at *2.)

Part II of the Contract provides that Statoil would sell and LOTT would buy 5,000 barrels per day of Mars (common stream quality) Crude Oil ("Mars"), at the following price:

> The arithmetic average (rounded to three decimal places) of the mid-points of Argus' spot crude price assessments for Domestic Sweet Crude Oil (17:00 Houston Cash) as reported in Argus America's Crude Report for the prompt (i.e., nearest future) delivery month being reported each Argus' business day for the calendar month of delivery (e.g., for barrels delivered in July, 2008 Buyer pays the average reported price for July, 2008 as reported from the 26th of the month two months prior to delivery through the 25th of the month prior to delivery, inclusive).

> Plus the weighted average of reported prices for Weighted MARS Differential for crude oil as published in Argus America's Crude Report when the month of delivery is the prompt trading month assessed by Argus (e.g., for barrels delivered in July, 2008, Buyer pays the average reported price for July, 2008 as reported from the 26th of the month two months prior to delivery through the 25th of the month prior to delivery, inclusive); plus $0.0300 per barrel differential.

(Contract at *2.)

Part III of the Contract includes a section titled "Other Terms and Conditions." That section incorporates a standard-form industry document known as the "Conoco

General Provisions" which sets forth certain general rules to govern domestic oil trading. (Joint 56.1 Stmt. ¶ 7; Contract at *4; Robeck Decl. Ex. 4: Conoco General Provisions dated Jan. 1, 1993 ("Conoco Provisions").) Paragraph J of the Conoco General Provisions is titled "Exchange Balancing" and provides:

> If volumes are exchanged, each party shall be responsible for maintaining the exchange in balance on a month-to-month basis, as near as pipeline or other transportation conditions will permit.... Volume imbalances confirmed by the 20th of the month shall be delivered during the calendar month after the volume imbalance is confirmed. Volume imbalances confirmed after the 20th of the month shall be delivered during the second calendar month after the volume imbalance is confirmed.

(Conoco Provisions at *2)

On September 1, 2008, Hurricane Gustav struck the Gulf Coast near Cocodrie, Louisiana. (LOTT Complaint dated Dec. 30, 2008 ("Compl.") ¶ 24; Statoil Answer dated Jan. 20, 2009 ("Ans.") ¶ 24.) On September 13, 2008, Hurricane Ike hit the northern end of Galveston Island, Texas. (Compl. ¶ 25; Ans. ¶ 25.) Both storms caused supply disruptions for Statoil. As a consequence, Statoil informed LOTT that it would not be able to fulfill its Mars delivery obligations for September 2008. (Compl. ¶ 26; Ans. ¶ 26.) That month, Statoil delivered only 5,000 of the 150,000 barrels due under the Contract. (Joint 56.1 Stmt. ¶ 14.) The 145,000 barrel shortfall was due entirely to supply disruptions caused by the hurricanes. (Joint 56.1 Stmt. ¶ 15.) In September, the Mars price per barrel was $112.916. (Joint 56.1 Stmt. ¶ 8.)

During a telephone conference call on September 23, 2008, Statoil trader Mark Brunenavs ("Brunenavs") and LOTT trader Kenner Harris ("Harris") agreed to cancel the November 2008 delivery. (Declaration of Carter L. Williams dated Mar. 10, 2010 ("Williams Decl.") Ex. H: Transcript of Telephone Conversation dated Sept. 23, 2008 ("Sept. 23 Call") at *2–3; Joint 56.1 Stmt. ¶ 15.) The two traders also agreed that Statoil would make up its September delivery shortfall in November 2008 by delivering so-called "payback barrels." (Sept. 23 Call at *2–3; Joint 56.1 Stmt. ¶¶ 19–21.) The traders concurred that these payback barrels would be priced using the September price:

> *Brunenavs:* So we've had—you know we have the price barrels that have already set for September.
>
> *Harris:* Right.
>
> *Brunenavs:* So those will be paid back at the Sept price in November[?]
>
> *Harris:* Right.

(Sept. 23 Call at *3.)

In October 2008, Statoil delivered only 99,301 barrels of the 155,000 required under the Contract. (Joint 56.1 Stmt. ¶¶ 17–19.) The 55,699 barrel shortfall again stemmed from the hurricane-induced disruptions. (Joint 56.1 Stmt. ¶ 19.) By October, the Mars price had fallen to $100,781 per barrel. (Joint 56.1 Stmt. ¶ 9.)

On October 27, 2008, LOTT Senior Vice President J. Larry Hartness ("Hartness") informed Statoil by letter that "LOTT will accept 'make-up' barrels at the Argus midpoint average for the month of delivery through January 31, 2009." (Williams Decl. Ex. J: Letter from J. Larry Hartness to Statoil dated Oct. 27, 2008.)

On November 5, 2008, Brunenavs responded that Statoil "expect[s] LOTT to pay the Mars price related to the months of intended delivery." (Williams Decl. Ex. K: Letter from Mark Brunenavs to J. Larry Hartness received Nov. 5, 2008.) Hartness replied that "[Statoil's] failure to deliver would not qualify as an imbalance

but rather as an event of force majeure because you delivered no barrels." (Williams Decl. Ex. L: Letter from J. Larry Hartness to Mark Brunenavs dated Nov. 6, 2008.)

In November 2008, the Mars price fell to $76,199 per barrel. (Joint 56.1 Stmt. ¶ 10.) That month, Statoil made a 176,000 barrel payback, making up all 145,000 barrels due from September and 31,000 of the barrels due from October. (Joint 56.1 Stmt. ¶¶ 21–23.) This left a balance of 24,699 payback barrels which Statoil planned to deliver in December. (Joint 56.1 Stmt. ¶ 22.) However, when Statoil attempted to deliver those barrels in December 2008, LOTT refused to accept them. (Joint 56.1 Stmt. ¶¶ 24–25.) Statoil then sold its Mars barrels to a third-party for $31.980 per barrel. (Joint 56.1 Stmt. ¶ 26.) In December 2008, LOTT paid $7,541,185.08 for Statoil's November Mars deliveries, an amount that reflected the October and November Mars prices. (Joint 56.1 Stmt. ¶ 38.) According to Statoil, LOTT withheld $5,919,578.32 in payment. (Joint 56.1 Stmt. ¶ 38.)

On December 30, 2008, LOTT filed a breach of contract action against Statoil (No. 08 Civ. 11315) seeking a declaration that the price of the payback barrels should be determined by the month of actual, as opposed to intended, delivery. On March 6, 2009, Statoil filed an action (No. 09 Civ.2081) claiming that LOTT breached a corporate guaranty by refusing to pay the amount due on the Mars deliveries, a figure which Statoil calculated using the September and October Mars prices for the month of intended delivery. Statoil submits evidence that LOTT's refusal to pay the price for the month of intended delivery contravened industry practice and LOTT's own dealings with other companies. (See, e.g., Williams Decl. Ex. V: Transcript of Deposition of Michael J. Barrett dated Jan. 19, 2010 ("Barrett Dep." at 92.) & Ex. Z: Transcript of Deposition of James Larry Hartness dated Oct. 16, 2009 ("Hartness Dep.") at 113–14, 124.)[1] There is also evidence that, in June 2008, before the dispute underlying this action, Statoil was unable to deliver the required number of barrels under the Contract. (Joint 56.1 Stmt. ¶¶ 35–36.) When Statoil delivered payback deliveries in July and August 2008, LOTT paid the prices for the actual months of delivery—July and August, which were higher than the June price. (Joint 56.1 Stmt. ¶¶ 36–37.) After this dispute arose, Statoil reimbursed LOTT $49,739.40 for the higher July and August prices it had received for those

---

**1.** After moving for summary judgment, LOTT filed a further Motion to Strike Statoil's Improper Summary Judgment Evidence (Docket Nos. 53, 54). LOTT asserts that Statoil's evidence is irrelevant because the proffered testimony concerns third-party contracts of a different order than the Contract at issue. LOTT further contends that this evidence is improper because it contradicts the plain language of the Contract. Federal Rule of Civil Procedure 56(e) provides that affidavits "must ... set out facts that would be admissible in evidence" to be considered on summary judgment. Because relevance is broadly defined under the Federal Rules of Evidence and the evidence submitted touches on similar, albeit not identical, exchange contracts, Statoil's submitted evidence would likely be admissible at trial. See Fed.R.Evid. 401. Indeed, several submissions that LOTT seeks to strike are affidavits or depositions by employees of LOTT and Statoil who were intimately involved in the underlying pricing dispute. As such, they appear to have personal knowledge of the matters at issue and specialized knowledge of the industry. Finally, as is more fully explained below, Section 2–202 of the Uniform Commercial Code clarifies that this type of evidence is relevant at the summary judgment stage. See Crescent Oil & Shipping Servs. Ltd. v. Phibro Energy, Inc., 929 F.2d 49, 52 (2d Cir.1991). Accordingly, LOTT's motion to strike certain submissions by Statoil is denied.

payback barrels. (Joint 56.1 Stmt. ¶¶ 37, 41.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Davis v. Blige*, 505 F.3d 90, 97 (2d Cir.2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party makes an initial showing that there is no genuine issue of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original); *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoting *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348). In determining whether a genuine factual dispute exists, a court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505; *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir.2005).

### II. The Oil Exchange Contract

■ Under New York law, the initial interpretation of a contract "is a matter of law for the court to decide." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996); *R/S Assocs. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 744 N.Y.S.2d 358, 771 N.E.2d 240, 242 (2002). Because the Contract concerns the purchase and sale of crude oil, it is governed by the Uniform Commercial Code's ("U.C.C.") sale of goods provisions. *See Crescent Oil & Shipping Servs. Ltd. v. Phibro Energy, Inc.*, 929 F.2d 49, 52 (2d Cir.1991); *Bulk Oil, Inc. v. Sun Oil Trading Co.*, 697 F.2d 481, 482 (2d Cir.1983). In general, a court must determine that a contract is ambiguous before resorting to extrinsic evidence that touches on the contract's meaning. *Duane Reade Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 390 (2d Cir.2005). However, when considering a sale of goods contract under the U.C.C, the determination of a contract's meaning is not made in a vacuum. Rather, it is done *in conjunction with* evidence about course of dealing, usage of trade, and the parties' course of performance so long as that extrinsic evidence does not contradict the contract's language. *See* N.Y. U.C.C. § 2–202, official cmt. 1: *Aceros Prefabricados, S.A. v. Tradearbed, Inc.*, 282 F.3d 92, 102 (2d Cir. 2002); *Paragon Res., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 695 F.2d 991, 995 (5th Cir.1983); *see also Div. of Triple T Serv., Inc. v. Mobil Oil Corp.*, 60 Misc.2d 720, 304 N.Y.S.2d 191, 202–03 (N.Y.Sup.Ct.1969) ("The Uniform Commercial Code has effected a change as regards sales contracts and evidence of custom or usage in the trade is admissible to determine the parties' true intention even if the contract terms are not ambiguous."). Section 2–202 of the U.C.C. guides this Court's interpretation and provides:

Terms ... which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented ... by course of dealing or usage of trade ... or by course of performance.

N.Y. U.C.C. § 2–202. This approach to construction is embraced by the commentary to Section 2–202, which rejects "[t]he premise that the language used has the meaning attributable to such language by rules of construction existing in the law rather than the meaning which arises out of the commercial context in which it was used." N.Y. U.C.C. § 2–202 cmt. 1(b); *Crescent Oil,* 929 F.2d at 52 (clarifying that the district court should have considered parol evidence at the summary judgment stage); *see also Amoco Prod. Co. v. Western Slope Gas Co.,* 754 F.2d 303, 307–08 (10th Cir.1985) ("Under the UCC, the lack of facial ambiguity in the contract language is basically irrelevant to whether extrinsic evidence ought to be considered by the court as an initial matter.").

■ Reviewing the Contract's pricing term, it is not apparent from the language alone whether "for the calendar month of delivery" refers to the actual or intended month of delivery. Primarily, the absence of any words modifying calendar month of delivery allows both parties to submit plausible interpretations of the Contract.

Considering the words "calendar month of delivery" in isolation, it might be logical to conclude that calendar month simply means the month oil arrives at LOTT's facility. However, that construction spawns mischief in interpreting other sections of Contract. The inconsistencies arise because the use of the phrase "month of delivery" is not a one-time occurrence; rather, the phrase is interspersed through-

out the Contract. First, "month of delivery" is used in Part I to describe the WTI price. The phrase then appears twice in Part II to describe the Mars price. The same phrase is used in both Parts because the parties appear to have intended that the two grades be priced over the same period of time. This makes sense in the context of an "exchange" agreement under which parties hedge their risk by eliminating volatile elements like time and changes in demand. Because the parties had reciprocal commitments to buy and sell the same quantities at the same time, the price difference between WTI and Mars depended only on the difference in the grades. Despite this contractual structure, LOTT's interpretation would require "month of delivery" to have two different meanings—for the WTI delivery, it would mean "September" and for the Mars delivery, it would mean "October and/or November." This division contravenes the general rule that "[t]erms in a document ... normally have the same meaning throughout the document in the absence of a clear indication that different meanings were intended." *Maryland Cas. Co. v. W.R. Grace & Co.,* 128 F.3d 794, 799 (2d Cir.1997) (citing 4 Samuel Williston & Walter H.E. Jaeger, A *Treatise on the Law of Contracts* § 618, at 715–716 (3d ed.1961)).

LOTT's interpretation also creates problems in reading Paragraph J of the incorporated Conoco General Provisions. Those Provisions include the caveat that pipeline conditions may necessitate a change in delivery time. However, the Provisions do not mention a price adjustment when delivery is delayed. As with Parts I and II of the Contract, there is no explicit language in the Conoco General Provisions that makes the plain meaning of the Contract apparent to this Court.

Even considering the usage of trade and course of dealing evidence, the price of oil

under the Contract cannot be determined as matter of law. "A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." N.Y. U.C.C. § 1–205(2); *see also Aceros Prefabricados,* 282 F.3d at 102. A course of dealing is the more narrow consideration of the "previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." N.Y. U.C.C. § 1–205(1).

With respect to usage of trade, Statoil proffers that the industry practice in the wake of Hurricanes Gustav and Ike was for purchasers to pay the "intended" price for delayed deliveries. Indeed, Statoil submits that LOTT was one of only two oil companies to demand that delayed shipments be re-priced to the month in which they are actually delivered. However, that industry data is directly contradicted by the parties' course of dealing. When Statoil fell short of its Mars delivery obligations in June 2008 and delivered payback barrels in July and August of that year, it commanded the (higher) July and August actual month of delivery prices. Only later, after this pricing dispute arose, did Statoil repay LOTT so that it received the lower June price for the intended month of delivery. It is not clear to this Court why the circumstances of that delay, other than Statoil's about-face, are materially different from the hurricane-induced postponements.

This extrinsic evidence, which represents only a fraction of the evidence submitted by the parties in their motion papers, is relevant to deciphering the meaning of the Contract. Because the meaning of the price term depends on so many factors, it is not an issue amenable to summary judgment. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir.1998) (*citing Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992)). In hindsight, the parties submit diametrically opposed interpretations of the Contract. Such a dispute presents a paradigmatic jury question.

### *CONCLUSION*

For the foregoing reasons, Lion Oil Trading & Transportation, Inc.'s motion for a declaratory judgment is denied. This Court will hold a conference with the parties on September 10, 2010, at 10:00 a.m.

SO ORDERED.