[Cite as *Gatling Ohio, L.L.C. v. Allegheny Energy Supply Co., L.L.C.*, 2015-Ohio-5548.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Gatling Ohio, LLC,                              :

       Plaintiff-Appellant/              :
       Cross-Appellee,

                              :               No. 15AP-221
v.                                     (C.P.C. No. 13CVH06-6206)

                              :
Allegheny Energy Supply Company, LLC,              (REGULAR CALENDAR)

                              :
       Defendant-Appellee/
       Cross-Appellant.                 :

---

D E C I S I O N

Rendered on December 31, 2015

---

*Matthew R. Wilson*; *Bailey & Glasser, LLP, Brian A. Glasser*, *Rodney A. Smith*, and *Maryl C. Sattler*, for appellant/cross-appellee.

*Roetzel & Andress, LPA*, and *Michael R. Traven*; *Meyer, Unknovic & Scott, LLP, Russell J. Ober, Jr.*, and *Andrew L. Noble*, for appellee/cross-appellant.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Plaintiff-appellant/cross-appellee, Gatling Ohio, LLC ("Gatling"), appeals the February 26, 2015 judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant-appellee/cross-appellant, Allegheny Energy Supply Company, LLC ("Allegheny"), on a coal sales contract dispute. For the reasons that follow, we reverse and remand the trial court judgment.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Our review of this case primarily hinges on whether Allegheny is required under contract to pay Gatling "Btu" price adjustments for coal Gatling furnished from a

substitute mine in 2012.  (Gatling's Brief, 14.)  A brief overview of the facts relevant to this appeal follows.

{¶ 3}    Under a Coal Sales Agreement ("CSA"), Gatling agreed to supply Allegheny a "Base Amount" of coal per year, for several years.  (CSA, Section 1.1.)  Specifically, the parties amended the CSA to require Gatling to supply 191,000 tons of coal in 2009, 720,000 tons of coal in 2010 with 360,000 tons excised, 1,000,000 tons of coal in 2011, and 439,000 tons of coal in the first nine months of 2012.

{¶ 4}    The parties set a "Base Price" for the coal in the CSA dependent on the coal meeting specified Btu and sulfur content standards.  (CSA, Section 7.1.)  Variations in the Btu or sulfur content of the coal triggered compensation to either party, calculated by applying applicable quality adjustments to arrive at an "Adjusted Base Price."   (CSA, Sections 7.2-7.3.)  In other words, under the CSA, if the Btu of the delivered coal exceeded the contract standard, Gatling would be compensated, while if the Btu of the delivered coal fell below the contract standard, Allegheny would be compensated.

{¶ 5}    At the end of 2010, Gatling provided Allegheny with written notice of Gatling's election to furnish coal from a mine other than the "Source Mine" stated in the CSA, as permitted under Section 1.2 of the CSA.  Specifically, Gatling elected to source between 360,000 and 475,000 tons of coal from the "Alpha" mine during the 2011 calendar year, at the "Base Price" set in Section 7.1 of the CSA.   (2011 Substitution Agreement, 1.)  Further, the 2011 substitution agreement provided that:

> In order to make Allegheny commercially neutral relative to the Alternative Source Coal, the Base Price for Alternative Source Coal shall be subject to adjustment as set forth in the [CSA] except that * * * Allegheny shall have no obligation to pay any premium under Section 7.2 of the Agreement for Alternative Source Coal having a monthly weighted average Typical Btu specification exceeding 12,000 Btu/lb.

(2011 Substitution Agreement, 1.)   Allegheny signed the notice, consenting to the arrangement "provided the [substitute coal] is supplied in strict accordance with the [2011] notice."   (2011 Substitution Agreement, 2.)   In 2011, Gatling delivered and Allegheny accepted coal from the substitute mine, and Allegheny did not pay Btu adjustments above the base price.

{¶ 6} At the end of 2011, Gatling provided Allegheny with another written notice of its election to source between 400,000 and 500,000 tons of coal from a mine other than the "Source Mine" stated in the CSA during the 2012 calendar year, at the "Base Price" set in Section 7.1 of the CSA. (2012 Substitution Agreement, 1.) This time, the 2012 substitution agreement did not include a paragraph eliminating Allegheny's obligation to pay Btu adjustments. Further, the 2012 substitution agreement closed by stating that "[c]apitalized terms not set forth herein shall have the meaning given them in the Agreement, which shall continue in full force and effect in accordance with its terms." (2012 Substitution Agreement, 1.) Allegheny again signed the notice, consenting to the arrangement "provided the [substitute coal] is supplied in strict accordance with the [2012] notice." (2012 Substitution Agreement, 2.)

{¶ 7} From January through July 2012, Gatling delivered and Allegheny accepted coal from the substitute mine. Gatling invoiced Allegheny monthly for both sulfur and Btu adjustments in January, February, and March. Allegheny paid the sulfur adjustments but did not pay the Btu adjustments for those months. Allegheny paid the Btu invoices for April, May, June, and July but did not pay the Btu invoice for August.

{¶ 8} In late August, an Allegheny[1] representative indicated in an email that it "stopped loading against [the Gatling] contract and will not resume until we have a resolution" regarding the Btu payments. (Aug. 24, 2012 email, 1.) Allegheny then recouped the Btu payments it paid to Gatling for the months of April, May, June, and July by withholding an equivalent amount from a subsequent undisputed invoice.

{¶ 9} On September 28, 2012, Gatling sent a letter to Allegheny regarding coal delivery and Btu adjustments. On October 10, 2012, Allegheny sent a letter acknowledging that the source mine was no longer operating, but revoking its acceptance of substitute coal under the 2012 substitution agreement, and seeking written confirmation of Gatling's ability to deliver source mine coal.

{¶ 10} On June 5, 2013, Gatling filed a complaint for breach of contract against Allegheny, which Allegheny answered on July 23, 2013. With leave of the court, on December 24, 2014, Gatling filed its first amended complaint, again based on breach of

---

[1] The email reflects signature blocks from FirstEnergy, the company with which Allegheny merged in 2011.

contract and citing Allegheny's failure to accept certain coal, including carryover tons, Allegheny's attempt to terminate its consent to the 2012 substitution agreement and to not accept substitute coal, and Allegheny's failure to pay invoiced amounts for Btu adjustments in 2012. On January 5, 2015, both parties filed motions for summary judgment. On January 7, 2015, Allegheny filed an amended answer and counterclaim, to which Gatling filed a motion to strike.

{¶ 11} The trial court granted Allegheny's motion for summary judgment and denied Gatling's motion for summary judgment on February 26, 2015. In doing so, the trial court found that the parties did not intend the base price referenced in the 2012 substitution agreement to include Btu adjustments. The court first established the original 2008 coal sales agreement, its two amendments, and the two substitution agreements as "one unified document," which it found to be unambiguous. (Feb. 26, 2015 Decision, 10.) The court then compared the language of the 2011 substitution agreement with the 2012 substitution agreement. The court determined that, because the 2011 notice included a specific statement that the base price would be subject to adjustment, the parties did not believe that the base price automatically included the adjustments listed in Section 7.2 of the CSA. Thus, "[t]he specific inclusion of adjustments in the 2011 Substitution Agreement read in conjunction with their exclusion in the 2012 Substitution Agreement" shows the parties' intention that "the Base Price charged under the 2012 Substitution Agreement would be the Base Price listed in section 7.1 of the CSA and nothing more." (Feb. 26, 2015 Decision, 12.) Therefore, the court concluded that Allegheny was not required to pay the Btu premiums charged by Gatling in 2012.

{¶ 12} The trial court's conclusion in favor of Allegheny on the Btu adjustments was dispositive of several additional issues. The trial court determined that Allegheny acted reasonably and did not breach the CSA in withdrawing its consent to accept Alpha mine coal in 2012 because, in the trial court's opinion, comparing the language of the 2011 and 2012 substitution agreements showed Allegheny's acceptance of Alpha coal in 2012 did not leave Allegheny commercially neutral. The trial court further determined that Allegheny was entitled to recoup the Btu payments it made by offsetting that amount against an unrelated invoice under the netting provision, Section 7.7 of the CSA, which provides a means for the parties to aggregate and offset obligations that the parties are

"required" to pay each other any amount in the same month. The trial court determined that Gatling was required to refund the overpayment because charging the Btu adjustments on coal delivered in 2012 was improper.

{¶ 13} In determinations unconnected to the Btu adjustments, the trial court found that Gatling was not entitled to compensation for certain carryover tons, a decision not appealed by Gatling. Finally, the trial court granted Gatling's motion to strike Allegheny's amended answer and counterclaim, finding Allegheny's explanations insufficient to explain why it waited over one and one-half years to bring its counterclaim.

{¶ 14} Both parties filed a timely appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 15} Gatling assigns four assignments of error for our review:

> 1. The trial court committed reversible error in holding that the Coal Sales Agreement ("CSA") did not require Allegheny to pay Btu adjustments on substitute coal supplied by Gatling Ohio during 2012 even though the unambiguous terms of the CSA and the 2012 Substitution Agreement required Allegheny to pay the Base Price and all quality adjustments for the 2012 substitute coal.
>
> 2. The trial court erred by holding that Allegheny was permitted to recoup Btu adjustments even though the CSA did not allow either party to unilaterally recoup funds by offset.
>
> 3. The trial court erred by holding that Allegheny was justified to withdraw its consent to accept the coal it agreed to accept through the 2012 Substitution Agreement.
>
> 4. The trial court erred by failing to address Gatling Ohio's argument that Allegheny anticipatorily repudiated the CSA by declaring that it would no longer accept any substitute coal when the CSA required Allegheny to consent to the delivery of substitute coal unless it was unreasonable to do so.

{¶ 16} Allegheny assigns one cross-assignment of error for our review:

> The Trial Court Erred by Striking Allegheny Energy Supply Company, LLC's Answer to Amended Complaint, Affirmative Defenses and Counterclaim (February 26, 2015 Decision and Entry).

## III.  DISCUSSION

### A.  Standard of Review

{¶ 17}  Pursuant to Civ.R. 56(C), "[s]ummary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Accordingly, summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978).

{¶ 18}  "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim."  *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996).  Once the moving party meets its initial burden, the nonmovant must demonstrate that a genuine issue of material fact exists "by directing the court's attention to evidentiary materials of the type listed in Civ.R. 56(C)."  *Crase v. Shasta Beverages, Inc.*, 10th Dist. No. 11AP-519, 2012-Ohio-326, ¶ 43, citing *Dresher* at 292; Civ.R. 56(E).

{¶ 19}  A fact is "material" if it "might affect the outcome of the suit under the applicable substantive law."  *Mitchell v. Mid-Ohio Emergency Servs., L.L.C.*, 10th Dist. No. 03AP-981, 2004-Ohio-5264, ¶ 12.  A "genuine" issue of material fact exists to prevent summary judgment only if "a reasonable jury could find that the evidence satisfies the evidentiary standards required at trial."  *Myocare Nursing Home, Inc. v. Fifth Third Bank*, 98 Ohio St.3d 545, 2003-Ohio-2287, ¶ 33.  Additionally, a nonmovant's own self-serving assertions, whether made in an affidavit, deposition or interrogatory responses, cannot defeat a well-supported summary judgment when not corroborated by any outside evidence. *White v. Sears, Roebuck & Co.*, 10th Dist. No 10AP-294, 2011-Ohio-204, ¶ 7.

{¶ 20}  Appellate review of summary judgments is de novo.  *Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 5.  When an

appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. *Id.*, citing *Maust v. Bank One Columbus, N.A.*, 83 Ohio App.3d 103, 107 (10th Dist.1992). "We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds." *Helfrich v. Allstate Ins. Co.*, 10th Dist. No. 12AP-559, 2013-Ohio-4335, ¶ 7, citing *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

### B. Appellant/Cross-Appellee's First Assignment of Error

{¶ 21} In its first assignment of error, Gatling contends the trial court erred in determining that Allegheny was not contractually required to pay Btu adjustments for 2012. For the following reasons, we agree with Gatling.

{¶ 22} Per the CSA, New York law controls the substantive issues of this appeal. "Under New York law, the initial interpretation of a contract 'is a matter of law for the court to decide.' " *Lion Oil Trading & Transp., Inc. v. Statoil Marketing & Trading (US) Inc.*, 728 F.Supp.2d 531, 535 (S.D.N.Y.2010), quoting *K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996). The parties agree that New York's statutory sections reflecting the Uniform Commercial Code ("U.C.C.") are applicable to this coal sales agreement. *See also* New York U.C.C. 2-205 and 2-207; *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 81 (1984); *SER Monongahela Power Co. v. Fox*, 227 W.Va. 531, 537 (2011).

{¶ 23} Under U.C.C. 2-202, terms which are set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement, but may be explained or supplemented by course of dealing, usage of trade, course of performance, and by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

{¶ 24} The form and content of a writing may be considered in whether that writing was intended to be the final expression of the parties' agreement. *Intershoe, Inc. v. Bankers Trust Co.*, 77 N.Y.2d 517, 519 (1991). Here, the 2012 substitution agreement,

along with the CSA it incorporates, sets out the essential terms of the parties' agreement for 2012 and is signed by both parties. Record evidence disputes the meaning, rather than the validity, of this agreement. Therefore, we find the 2012 substitution agreement to be a valid final expression of the parties' agreement as to the terms within it for 2012.

{¶ 25} Further, the terms of the 2012 substitution agreement and the CSA, which it directly references and incorporates, are clear. The 2012 substitution agreement states in pertinent part:

> This letter shall serve as notice of Gatling's election pursuant to Section 1.2 of the [CSA] to source a portion of its coal supply obligation from a location other than the Source Mine. Specifically, with respect to the tonnage scheduled for delivery in the calendar year 2012, Gatling intends to deliver between 400,000 and 500,000 tons from [Alpha mine]. The Delivery Point for the Alternative Source Coal will be Alpha's loadout located on or near milepost 81.5 on the Monongahela River at the Base Price set forth in Section 7.1 of the Agreement.
>
> Capitalized terms not set forth herein shall have the meaning given them in the Agreement, which shall continue in full force and effect in accordance with its terms. Please sign this letter in the space provided on the following page indicating your approval of the above.

(2012 Substitution Agreement, 1.)

{¶ 26} Section 1.2 of the CSA, which the 2012 substitution agreement specifies to be in full force and effect in accordance with it terms, provides that:

> [Gatling] may in its discretion, but without obligation, with the prior written approval of [Allegheny], which approval shall not be unreasonably withheld, furnish all or any part of the coal to be supplied hereunder from other source(s), on the same terms and conditions set forth in this Agreement, and at the same Base Price to [Allegheny] as coal supplied from the Source Mine, provided [Allegheny] is (or is made by payment or adjustment of the Base Price) commercially and operationally neutral to receiving and burning coal from such substitute source rather than from the Source Mine.

{¶ 27} Section 7.3 of the CSA, which the 2011 substitution agreement specifies to be in full force and effect in accordance with its terms, states that "the applicable Base Price for any calendar month shall be increased or reduced by the cumulative total of all

applicable quality adjustments for such Sample Period (the Base Price, as so adjusted, being referred to herein as the "Adjusted Base Price"). (Emphasis sic.) Moreover, "Adjusted Base Price," as a capitalized term not set forth in the 2012 substitution agreement, retains the meaning given to it in the CSA.

{¶ 28} Thus, under the CSA, the default terms for substitution of coal are the "same terms and conditions" as those that apply to source mine coal, including supplying the substitute coal at the "same Base Price" as source mine coal, subject to adjustments including those for Btu. (CSA, Section 1.2.) The 2012 substitution agreement, like Section 1.2, invokes the base price and leaves every other term and condition in the CSA, including those provisions regarding Btu adjustments, intact. Therefore, the 2012 substitution agreement, read in conjunction with the CSA it incorporates by reference, plainly reflects the default substitution arrangement to provide coal from other sources at the base price subject to adjustments.

{¶ 29} The trial court, under the banner of both a unified agreement and a prior dealing of the parties, used the 2011 substitution agreement to contradict the 2012 substitution agreement and CSA terms. Under New York U.C.C. 2-202, use of the prior 2011 substitution agreement to contradict the plain meaning of the 2012 substitution agreement and CSA is impermissible. *See also W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163 (1990), quoting *Intercontinental Planning v. Daystrom, Inc.,* 24 N.Y.2d 372, 379 (1969). ("It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.' ").

{¶ 30} Considering the above, we agree with Gatling that the trial court erred in considering the 2011 substitution agreement to contradict the terms of the 2012 substitution agreement and CSA to preclude Btu adjustments for 2012 substitute coal. Therefore, we remand the case to the trial court to consider the propriety of the 2012 Btu adjustments without contradictory impact from the 2011 substitution agreement and to consider whether factual issues remain regarding whether Allegheny was made commercial and operationally neutral as provided in Section 1.2 of the CSA, and whether Gatling supplied the alternative source coal in "strict accordance" with the 2012 substitution agreement. (2012 Substitution Agreement, 2.)

{¶ 31} Accordingly, Gatling's first assignment of error is sustained.

### C. Appellant/Cross-Appellee's Second Assignment of Error

{¶ 32} In its second assignment of error, Gatling contends that the trial court erred in holding that "Allegheny was permitted to recoup Btu adjustments even though the CSA did not allow either party to unilaterally recoup funds by offset." (Gatling's Brief, 1.) However, because the trial court factored into its recoupment decision a conclusion regarding the Btu payments that we have determined in the first assignment of error to be erroneously derived using the 2011 substitution agreement, Gatling's second assignment of error is likewise sustained.

### D. Appellant/Cross-Appellee's Third and Fourth Assignments of Error

{¶ 33} The disposition of Gatling's first assignment of error renders Gatling's third assignment of error, challenging Allegheny's withdrawal of consent to accept coal, and Gatling's fourth assignment of error, challenging Allegheny's alleged anticipatory repudiation of the CSA, premature and unnecessary at this time. Accordingly, Gatling's third and fourth assignments of error are rendered moot. App.R. 12(A)(1)(c).

### E. Appellee/Cross-Appellant's Assignment of Error

{¶ 34} In its cross-assignment of error, Allegheny contends the trial court erred in striking its January 7, 2015 answer to Gatling's amended complaint because it only learned the basis of its counterclaims in November 2014 and promptly filed its counterclaims thereafter. We disagree.

{¶ 35} A trial court's ruling on a motion to strike a counterclaim is reviewed under an abuse of discretion standard. *Mulhollen v. Angel*, 10th Dist. No. 03AP-1218, 2005-Ohio-578, ¶ 26; *RotoSolutions, Inc. v. Crane Plastics Siding, L.L.C.*, 10th Dist. No. 13AP-1, 2013-Ohio-4343, ¶ 14. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 36} Generally, a counterclaim, whether compulsory or permissive, must be filed in an answer. Civ.R. 13(A)-(B); Civ.R. 12(B). Where the plaintiff files an amended complaint, the defendant is not permitted to assert counterclaims unrelated to the amendment and omitted in his initial answer. *Mihalich v. Heyden, Heyden & Hindinger,*

*II*, 9th Dist. No. 21318, 2003-Ohio-2848, ¶ 26-31.  However, "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment."  Civ.R. 13(F).  "Thus, pursuant to Civ.R. 13(F), a party cannot assert an omitted counterclaim without first seeking and receiving leave of court to file that counterclaim in an amended answer."  *Mulhollen* at ¶ 27.  "If a party files a counterclaim without the trial court's authorization, the trial court may, in its discretion, strike that counterclaim."  *Id.*

{¶ 37} Here, Gatling filed the original complaint on June 5, 2013, and Allegheny answered on July 23, 2013.  Allegheny's answer did not include counterclaims.  On November 18, 2014, during a deposition, Gatling representative Michael Moran denied the existence of a verbal agreement with Allegheny representative Mark Fraley, which allegedly required Allegheny to pay sulfur adjustments but not Btu adjustments.  On December 24, 2014, Gatling filed an amended complaint, which added an omitted exhibit and corrected the style of the case.  Allegheny filed an answer to the amended complaint on January 7, 2015, two days after the parties filed motions for summary judgment, and asserted, for the first time, two counterclaims for breach of contract and unjust enrichment relating to the amount Allegheny paid to Gatling for sulfur adjustments in 2012.  Gatling filed a motion to strike Allegheny's amended answer and counterclaims, raising the fact that Allegheny failed to seek leave of the court as required by rule, could not show that its failure to raise the claims in its initial answer was the result of excusable neglect, and alternatively asserted the counterclaims failed to state a claim on which relief should be granted under Civ.R. 12(B)(6).  In the body of its response to the motion to strike, Allegheny requested that the court nonetheless grant it leave to file the counterclaims.

{¶ 38} As discussed, the trial court granted Gatling's motion to strike, finding Allegheny's assertion of the counterclaims to be "too late," and Allegheny's reasons for waiting over one and one-half years to assert the counterclaims unsatisfactory.  (Feb. 26, 2015 Decision, 17.)  On appeal, Allegheny argues that the court should have permitted it to file an answer with, for the first time, counterclaims for breach of contract and unjust enrichment relating to the amount Allegheny paid to Gatling for sulfur adjustments in 2012, because it allegedly learned the basis for this claim in November 2014 during the

deposition of Moran, and filed its counterclaim promptly thereafter. Allegheny additionally argues the trial court erred in failing to consider whether Gatling would be prejudiced by filing of the counterclaims.

{¶ 39} However, Allegheny did not seek or receive leave of court prior to filing its counterclaims, which, under *Mulhollen*, is grounds alone to strike the counterclaim. Even those cases cited by Allegheny that emphasize prejudice as a key analytical consideration for Civ.R. 13(F) challenges begin with the proponent first seeking the court's leave before filing the amendment. *See, e.g., Triangle Properties, Inc. v. Homewood Corp.*, 10th Dist. No. 12AP-933, 2013-Ohio-3926, ¶ 26; *Body Power, Inc. v. Mansour*, 1st Dist. No. C-130479, 2014-Ohio-1264, ¶ 24; *McConnell v. Hunt Sports Ents.*, 132 Ohio App.3d 657, 679 (10th Dist.1999). Furthermore, we cannot find the trial court's exercise of discretion to be unreasonable, arbitrary, or unconscionable where the premise of Allegheny's argument awkwardly rests on its learning about the nonexistence of its own agreement and record evidence produced during discovery shows that Gatling disputed the existence of an oral agreement as early as April 2012. Therefore, considering all the above, the trial court did not abuse its discretion in granting Gatling's motion to strike.

{¶ 40} Accordingly, Allegheny's cross-assignment of error is overruled.

## IV.  CONCLUSION

{¶ 41} Having sustained Gatling's first and second assignments of error, rendered Gatling's third and fourth assignments of error moot, and overruled Allegheny's cross-assignment of error, we hereby reverse the judgment of the Franklin County Court of Common Pleas and remand this matter to the trial court for further proceedings consistent with this decision.

*Judgment affirmed in part, reversed in part;*
*cause remanded.*

LUPER SCHUSTER and HORTON, JJ., concur.

_____