[Cite as *Gatling Ohio, L.L.C. v. Allegheny Energy Supply Co., L.L.C.*, 2018-Ohio-3636.]

### IN THE COURT OF APPEALS OF OHIO

### TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Gatling Ohio, LLC, | : | |
| Plaintiff-Appellant/ Cross-Appellee, | : | |
| | : | No. 17AP-188 |
| v. | | (C.P.C. No. 13CV-6206) |
| | : | |
| Allegheny Energy Supply Co., LLC, | | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellee/ Cross-Appellant. | : | |

## D E C I S I O N

### Rendered on September 11, 2018

**On brief:** *Meyer & Wilson Co., LPA, Matthew R. Wilson,* and *Michael J. Boyle, Jr.*; *Bailess Smith PLLC* and *Rodney A. Smith*; *Bailey & Glasser, LLP, Brian A. Glasser,* and *Maryl C. Sattler,* for appellant/cross-appellee Gatling Ohio, LLC. **Argued:** *Brian A. Glasser.*

**On brief:** *Roetzel & Andress, LPA, Stephen D. Jones,* and *Jeremy S. Young*; *Meyer, Unkovic & Scott LLP, Russell J. Ober, Jr.,* and *Andrew L. Noble,* for appellee/cross-appellant Allegheny Energy Supply Co., LLC. **Argued:** *Russell J. Ober, Jr.*

APPEAL from the Franklin County Court of Common Pleas

HORTON, J.

{¶ 1} Plaintiff-appellant/cross-appellee, Gatling Ohio, LLC ("Gatling"), and defendant-appellee/cross-appellant, Allegheny Energy Supply Co., LLC ("Allegheny"), both appeal from the judgment of the Franklin County Court of Common Pleas. The trial court rejected Gatling's claim that Allegheny breached a coal sales agreement by refusing to accept coal from a substitute source, but awarded damages to Gatling arising from unpaid charges for coal that Allegheny had accepted. For the reasons set forth below, we affirm the

trial court's judgment in all respects except for the discrete issue of the prejudgment interest rate, and reverse and remand solely for the trial court to apply the parties' contractually agreed upon rate of interest for damages.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2}    This is the second appeal in this litigation. In *Gatling Ohio, LLC v. Allegheny Energy Supply Co., LLC*, 10th Dist. No. 15AP-221, 2015-Ohio-5548, ¶ 3-12 (hereinafter "*Gatling I*"), we set forth the following summary of the factual background of this dispute:

> Under a Coal Sales Agreement ("CSA"), Gatling agreed to supply Allegheny a "Base Amount" of coal per year, for several years. (CSA, Section 1.1.) Specifically, the parties amended the CSA to require Gatling to supply 191,000 tons of coal in 2009, 720,000 tons of coal in 2010 with 360,000 tons excised, 1,000,000 tons of coal in 2011, and 439,000 tons of coal in the first nine months of 2012.
>
> The parties set a "Base Price" for the coal in the CSA dependent on the coal meeting specified Btu and sulfur content standards. (CSA, Section 7.1.) Variations in the Btu or sulfur content of the coal triggered compensation to either party, calculated by applying applicable quality adjustments to arrive at an "Adjusted Base Price." (CSA, Sections 7.2-7.3.) In other words, under the CSA, if the Btu of the delivered coal exceeded the contract standard, Gatling would be compensated, while if the Btu of the delivered coal fell below the contract standard, Allegheny would be compensated.
>
> At the end of 2010, Gatling provided Allegheny with written notice of Gatling's election to furnish coal from a mine other than the "Source Mine" stated in the CSA, as permitted under Section 1.2 of the CSA. Specifically, Gatling elected to source between 360,000 and 475,000 tons of coal from the "Alpha" mine during the 2011 calendar year, at the "Base Price" set in Section 7.1 of the CSA. (2011 Substitution Agreement, 1.) Further, the 2011 substitution agreement provided that:
>
> In order to make Allegheny commercially neutral relative to the Alternative Source Coal, the Base Price for Alternative Source Coal shall be subject to adjustment as set forth in the [CSA] except that * * * Allegheny shall have no obligation to pay any premium under Section 7.2 of the Agreement for Alternative Source Coal having a monthly weighted average Typical Btu specification exceeding 12,000 Btu/lb.

(2011 Substitution Agreement, 1.) Allegheny signed the notice, consenting to the arrangement "provided the [substitute coal] is supplied in strict accordance with the [2011] notice." (2011 Substitution Agreement, 2.) In 2011, Gatling delivered and Allegheny accepted coal from the substitute mine, and Allegheny did not pay Btu adjustments above the base price.

At the end of 2011, Gatling provided Allegheny with another written notice of its election to source between 400,000 and 500,000 tons of coal from a mine other than the "Source Mine" stated in the CSA during the 2012 calendar year, at the "Base Price" set in Section 7.1 of the CSA. (2012 Substitution Agreement, 1.) This time, the 2012 substitution agreement did not include a paragraph eliminating Allegheny's obligation to pay Btu adjustments. Further, the 2012 substitution agreement closed by stating that "[c]apitalized terms not set forth herein shall have the meaning given them in the Agreement, which shall continue in full force and effect in accordance with its terms." (2012 Substitution Agreement, 1.) Allegheny again signed the notice, consenting to the arrangement "provided the [substitute coal] is supplied in strict accordance with the [2012] notice." (2012 Substitution Agreement, 2.)

From January through July 2012, Gatling delivered and Allegheny accepted coal from the substitute mine. Gatling invoiced Allegheny monthly for both sulfur and Btu adjustments in January, February, and March. Allegheny paid the sulfur adjustments but did not pay the Btu adjustments for those months. Allegheny paid the Btu invoices for April, May, June, and July but did not pay the Btu invoice for August.

In late August, an Allegheny representative indicated in an email that it "stopped loading against [the Gatling] contract and will not resume until we have a resolution" regarding the Btu payments. (Aug. 24, 2012 email, 1.) Allegheny then recouped the Btu payments it paid to Gatling for the months of April, May, June, and July by withholding an equivalent amount from a subsequent undisputed invoice.

On September 28, 2012, Gatling sent a letter to Allegheny regarding coal delivery and Btu adjustments. On October 10, 2012, Allegheny sent a letter acknowledging that the source mine was no longer operating, but revoking its acceptance of substitute coal under the 2012 substitution agreement, and seeking written confirmation of Gatling's ability to deliver source mine coal.

On June 5, 2013, Gatling filed a complaint for breach of contract against Allegheny, which Allegheny answered on July 23, 2013. With leave of the court, on December 24, 2014, Gatling filed its first amended complaint, again based on breach of contract and citing Allegheny's failure to accept certain coal, including carryover tons, Allegheny's attempt to terminate its consent to the 2012 substitution agreement and to not accept substitute coal, and Allegheny's failure to pay invoiced amounts for Btu adjustments in 2012. On January 5, 2015, both parties filed motions for summary judgment. On January 7, 2015, Allegheny filed an amended answer and counterclaim, to which Gatling filed a motion to strike.

The trial court granted Allegheny's motion for summary judgment and denied Gatling's motion for summary judgment on February 26, 2015. In doing so, the trial court found that the parties did not intend the base price referenced in the 2012 substitution agreement to include Btu adjustments. The court first established the original 2008 coal sales agreement, its two amendments, and the two substitution agreements as "one unified document," which it found to be unambiguous. (Feb. 26, 2015 Decision, 10.) The court then compared the language of the 2011 substitution agreement with the 2012 substitution agreement. The court determined that, because the 2011 notice included a specific statement that the base price would be subject to adjustment, the parties did not believe that the base price automatically included the adjustments listed in Section 7.2 of the CSA. Thus, "[t]he specific inclusion of adjustments in the 2011 Substitution Agreement read in conjunction with their exclusion in the 2012 Substitution Agreement" shows the parties' intention that "the Base Price charged under the 2012 Substitution Agreement would be the Base Price listed in section 7.1 of the CSA and nothing more." (Feb. 26, 2015 Decision, 12.) Therefore, the court concluded that Allegheny was not required to pay the Btu premiums charged by Gatling in 2012.

The trial court's conclusion in favor of Allegheny on the Btu adjustments was dispositive of several additional issues. The trial court determined that Allegheny acted reasonably and did not breach the CSA in withdrawing its consent to accept Alpha mine coal in 2012 because, in the trial court's opinion, comparing the language of the 2011 and 2012 substitution agreements showed Allegheny's acceptance of Alpha coal in 2012 did not leave Allegheny commercially neutral. The trial court further determined that Allegheny was entitled to recoup the Btu payments it made by offsetting that amount against an

unrelated invoice under the netting provision, Section 7.7 of the CSA, which provides a means for the parties to aggregate and offset obligations that the parties are "required" to pay each other any amount in the same month. The trial court determined that Gatling was required to refund the overpayment because charging the Btu adjustments on coal delivered in 2012 was improper.

{¶ 3} We reversed and remanded, holding that the trial court had erred in its interpretation of the parties' agreements:

> The trial court, under the banner of both a unified agreement and a prior dealing of the parties, used the 2011 substitution agreement to contradict the 2012 substitution agreement and CSA terms. Under New York U.C.C. 2-202, use of the prior 2011 substitution agreement to contradict the plain meaning of the 2012 substitution agreement and CSA is impermissible. *See also W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 163, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990), quoting *Intercontinental Planning v. Daystrom, Inc.*, 24 N.Y.2d 372, 379, 248 N.E.2d 576, 300 N.Y.S.2d 817 (1969). "It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.' ").
>
> Considering the above, we agree with Gatling that the trial court erred in considering the 2011 substitution agreement to contradict the terms of the 2012 substitution agreement and CSA to preclude Btu adjustments for 2012 substitute coal. Therefore, we remand the case to the trial court to consider the propriety of the 2012 Btu adjustments without contradictory impact from the 2011 substitution agreement and to consider whether factual issues remain regarding whether Allegheny was made commercial and operationally neutral as provided in Section 1.2 of the CSA, and whether Gatling supplied the alternative source coal in "strict accordance" with the 2012 substitution agreement. (2012 Substitution Agreement, 2.)

*Id.* at ¶ 29-30.

{¶ 4} After remand, Gatling filed a motion for partial summary judgment, which the trial court overruled. (Sep. 29, 2016 Decision.) The trial court conducted a bench trial from October 17 t0 26, 2016. On February 21, 2017, the trial court filed a decision in the form of a final judgment entry with multiple findings of fact and rulings on Gatling's breach of contract claims. (Feb. 21, 2017 Final Jgmt. Entry.)

{¶ 5}   The trial court found that Gatling had "presented insufficient evidence" to prove its claim that Allegheny had breached the Coal Sales Agreement ("CSA"). The trial court stated that Gatling had the burden to show that Allegheny had remained "commercially and operationally neutral" when accepting the substitute coal in order to prove that Allegheny's refusal to accept the coal amounted to a breach of the CSA. (Final Jgmt. Entry at 9.) The trial court interpreted the phrase "commercially and operationally neutral" to mean that Allegheny could not "be placed in a worse position by the acceptance of substitute coal then it would have been by the acceptance of Source Mine coal," and that Allegheny "must be in the same position it would have been [in] had the CSA been performed as originally intended." (Final Jgmt. Entry at 10.)

{¶ 6}   The trial court's analysis of the commercial and operational neutrality of the transactions began with a comparison of the parties' performances under the 2011 Substitution Agreement and the 2012 Substitution Agreement. Before its amendment by those agreements, the CSA had originally specified that in 2011, Gatling was to supply one million tons of coal containing 12,000 Btu per pound, resulting in a Btu value of 24 trillion. Under the 2011 Substitution Agreement, the parties agreed that Gatling would supply coal from the Alpha Mine instead of the coal from the Source Mine. Because the Alpha Mine coal had 13,000 Btu per ton, Allegheny would be required to accept 720 billion more Btu than under the CSA. The trial court noted that this would have violated the requirement that any substitution be commercially and operationally neutral, but for the parties' decision to include a "waiver" in the 2011 Substitution Agreement of the surcharge for higher Btu coal required by Section 7.2 of the CSA. Thus, Allegheny remained commercially and operationally neutral by Gatling's provision of substitute coal under the 2011 Substitution Agreement. (Final Jgmt. Entry at 11-12.)

{¶ 7}   In contrast, the 2012 Substitution Agreement did not contain any language that waived the Section 7.2 requirement to calculate a higher price for coal shipments with elevated Btu levels. The trial court found that Gatling had shipped Allegheny 440,000 tons of coal in 2012 with a Btu value of 13,000. The trial court found that this was not commercially and operationally neutral, reasoning as follows:

> Pursuant to the 2012 Substitution Agreement, Defendant was required to accept and pay for an additional 880,000,000,000 Btu that it was not required to buy under the CSA, as amended.

> Furthermore, the 2012 Substitution Agreement did not have the same concession found in the 2011 Substitution Agreement essentially waiving payment for these extra Btu. This clearly puts Defendant in a worse position than it would have been if the CSA had been performed as originally intended. Therefore, the 2012 Substitution Agreement did not render Defendant commercially neutral.
>
> The numbers are clear. Defendant was placed at a detriment pursuant to the terms of the 2012 Substitution Agreement. If fully performed, the 2012 Substitution Agreement would have required Defendant to buy 880,000,000,000 Btu in 2012 that it was not required to buy under the terms of the CSA, as amended. The Court cannot find that Defendant was left commercially neutral in relation to the 2012 Substitution Agreement. Since this is so, along with the lack of evidence presented by Plaintiff as to actual neutrality, the Court must rule in favor of Defendant and find that it did not breach the CSA by refusing to accept any further Alpha Mine coal in 2012.

(Final Jgmt. Entry at 13.)

{¶ 8} In addition, the trial court also found that Gatling had failed to prove that it suffered any damages from Allegheny's refusal to accept substitute coal in 2012. The ruling on damages was two-pronged. First, the trial court found that there was "no evidence" that Gatling was ever obligated to buy the substitute coal from the two entities involved in its procurement, Alpha Coal Sales, LLC ("Alpha") and Foresight Coal Sales, LLC ("Foresight"). (Final Jgmt. Entry at 14.) The trial court noted that Gatling was a party only to the CSA, the 2011 Substitution Agreement, and the 2012 Substitution Agreement, but not the January 27, 2012 agreement between Alpha and Foresight for 440,000 tons of coal. The trial court emphasized the fact that the latter agreement nowhere identified Foresight as an agent of Gatling, and observed that "[t]he only relationship that they have to each other is common ownership at some corporate level." *Id.* The trial court rejected Gatling's assertion that Foresight was its agent, even though "multiple witnesses" had so testified. (Final Jgmt. Entry at 15.) According to the trial court, "stating this is not enough," and there was not "a shred of documentary evidence to show that Foresight was [Gatling's] agent." *Id.*

{¶ 9} Second, the trial court found that Gatling had never paid Foresight for the coal that Allegheny had refused to accept, stating that there was "no evidence that Foresight ever received any money from [Gatling] for the coal that [Allegheny] refused to accept, nor

is there evidence that Foresight remitted payment" to Gatling after it had sold the coal from Alpha to third parties. (Final Jgmt. Entry at 15.) The trial court described Gatling "essentially as a pass through entity" that would funnel Allegheny's payments for coal to Foresight. This conclusion was based on the testimony of Robert Keith Varney, a witness for Gatling, and an examination of a number of Gatling's general ledger accounting entries. (Final Jgmt. Entry at 16-18.) However, although Varney testified that Gatling had paid Alpha for all the substitute coal delivered to Allegheny from 2011 to 2013, there were no accounting entries after December 2012 to corroborate this assertion. Based on this evidence, the trial court concluded that Gatling had never "paid anybody" or "was ever responsible" for the coal that Allegheny refused, and, therefore, "no evidence" that Gatling had "actually sustained damages" arising from Allegheny's refusal to accept the coal in 2012. (Final Jgmt. Entry at 18-19.)

{¶ 10} Finally, the trial court ruled that Gatling was entitled to $1,644,848.94 in damages for coal that Allegheny had accepted but refused to pay. Thus, the trial court entered partial judgment in favor of Gatling for that amount, plus interest at the statutory rate, but entered judgment in favor of Allegheny on Gatling's breach of contract claim arising from Allegheny's refusal to accept substitute coal in 2012. (Final Jgmt. Entry at 21-22.)

{¶ 11} The parties have both appealed. After setting forth the appropriate standard of review, our analysis will begin with Gatling's appeal before turning to Allegheny's cross-appeal.

## II. STANDARD OF REVIEW

{¶ 12} A manifest weight of the evidence standard applies to appellate review of a judgment entered after a bench trial. App.R. 12(C). Under this standard, a reviewing court must be "guided by a presumption that the findings of the trier-of-fact were indeed correct." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id.*, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978). However, a de novo standard of review applies to matters of law, including the interpretation and construction of written contracts. *Long Beach Assn. v. Jones*, 82 Ohio St.3d 574, 576

(1998). Under the de novo standard, the court of appeals gives no deference to a trial court's interpretation of legal issues. *See, e.g., Holt v. State*, 10th Dist. No. 10AP-214, 2010-Ohio-6529, ¶ 9.

{¶ 13} As noted in *Gatling I*, the parties agreed in a choice of law provision in the CSA that New York law would govern any dispute arising out of the agreement. *Gatling I* at ¶ 22; CSA Section 11.

## III. GATLING'S APPEAL

{¶ 14} Gatling asserts the following assignments of error:

1. The trial court erred in holding that Allegheny was permitted to renege on the Contract.

2. The trial court erred by disregarding Allegheny's anticipatory repudiations of the Contract.

3. Because the trial court based its findings that Allegheny was not commercially and operationally neutral under the 2012 Substitution Agreement using a factor (high Btu) that was present when the consent was signed, the holding is an error.

4. The trial court erred by using a theory of lack of consideration for the Contract as "support for the [c]ourt's decision" despite the fact that it is the law of the case that the contract is valid, and the trial court ultimately "resolve[d] this issue [in] favor of Plaintiff."

5. The trial court erred by failing to apply Contract Section 7.5.

6. The trial court erred by failing to apply Contract Section 16.0.

7. The trial court erred by holding that Plaintiff bore the burden of proof on Allegheny's commercial and operational neutrality defense.

8. The trial court erred in holding that Gatling did not suffer damages due to Allegheny's refusal to accept the last 150,466 tons of coal under the Contract.

9. The trial court erred in holding that a written agreement was required to establish an agency relationship between Gatling and Foresight Coal Sales.

10. The trial court erred by failing to award Gatling damages for the coal Allegheny refused to accept.

11. The trial court erred by failing to award Gatling interest at the contractually-agreed rate.

12. The trial court erred by finding that Allegheny was not commercially and operationally neutral under the 2012 Substitution Agreement.

13. The trial court erred by finding that Foresight Coal Sales was not Gatling's agent.

{¶ 15} Gatling describes the first eleven of the foregoing statements as "Legal Errors Subject to De Novo Review" and the last two statements as "Factual Errors Contrary to the Manifest Weight of the Evidence." The appropriate standards of review will be addressed in the analysis, which will also address the assignments of error out of order and in groupings that more accurately correspond to the specific rulings of the trial court challenged by this appeal.

## A. Gatling's First Assignment of Error

{¶ 16} In Gatling's first assignment of error, it asserts that the trial court erred by "holding that Allegheny was permitted to renege" on the CSA. However, there is no discussion of a determination by the trial court that Allegheny could "renege" on the CSA in Gatling's brief. Under App.R. 16(A)(7), a party's brief must contain "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes and parts of the record on which appellant relies." Without an argument supporting the assignment of error, Gatling fails to provide the necessary grounds for its consideration under App.R. 16(A)(7).

{¶ 17} In addition, the trial court's decision is devoid of any determination that Allegheny was "permitted to renege" on the parties' agreement. Insofar as Gatling intends for the word "renege" to describe a breach or anticipatory repudiation of the CSA, this assignment of error is duplicative of others presented. Accordingly, the first assignment of error is overruled.

## B. Gatling's Fourth Assignment of Error

{¶ 18} The fourth assignment of error asserts that the trial court erred by applying "a theory of lack of consideration" to the parties' agreement, where, under the law of the

case, the CSA was a valid contract and, in fact, the issue of its validity was resolved in Gatling's favor.

{¶ 19} In a discussion prefacing the main section of its analysis, the trial court found that because Gatling did "not own any mine located in New Haven, West Virginia," as stated in the CSA, the agreement was "essentially a contract for the sale of coal that [Gatling] does not own, control, or have the right to sell." (Final Jgmt. Entry at 8.) Although the trial court considered this to be "a lack of consideration" that "render[ed] the contract unenforceable," it nevertheless stated that the lack of consideration was "a mere technicality" and concluded that the contract should be enforced. *Id.*

{¶ 20} We agree that the trial court did engage in an erroneous and unnecessary analysis of the validity of the CSA when it determined that the agreement lacked consideration because it misidentified the location of Gatling's coal mine. "Absent fraud or unconscionability, the adequacy of consideration is not a proper subject for judicial scrutiny." *Apfel v. Prudential-Bache Secs., Inc.*, 81 N.Y.2d 470, 476 (1993). Even an exchange that is "grossly unequal or of dubious value" may constitute valid consideration. *Id.* Here, as Gatling points out, there was ample consideration for the agreement between the parties, as Gatling had provided coal to Allegheny in exchange for $126 million between 2008 and 2012. Furthermore, even if, as the trial court asserted, the misidentified coal mine in the agreement was somehow indicative that Gatling lacked title to the coal it sold, "[t]he fact that the sellers may not have had a property right in what they sold does not, by itself, render the contract void for lack of consideration." *Id.*

{¶ 21} Nevertheless, it is not clear what motivates Gatling to assert this assignment of error. The trial court ultimately found that the CSA was a valid, enforceable agreement. The validity of the CSA is the premise behind any claim for a breach of that agreement. Thus, the trial court's ruling did not prejudice Gatling in any way and, in fact, worked to its benefit. Without the presumption of the agreement's validity, Gatling would have been unable to prosecute its breach of contract claims. At most, the trial court's discussion of the validity of the CSA amounted to harmless error. Under Civ.R. 61, "any error or defect in the proceeding which does not affect the substantial rights of the parties" must be disregarded. "A reviewing court will not disturb a judgment unless the error contained within is materially prejudicial to the complaining party." *Alternatives Unlimited-Special, Inc. v.*

*Ohio Dept. of Edn.*, 10th Dist. No. 12AP-647, 2013-Ohio-3890, ¶ 39, citing *Guertin v. Guertin*, 10th Dist. No. 06AP-1101, 2007-Ohio-2008, ¶ 13. Because the trial court's erroneous analysis of consideration and ultimate finding that the CSA was a valid agreement did not prejudice Gatling in any way, the fourth assignment of error is overruled.

### C. Gatling's Third and Twelfth Assignments of Error

{¶ 22} Assignments of error three and twelve challenge the trial court's ruling that Gatling could not prove its breach of contract claim premised on Allegheny's refusal to accept further substitute coal.

{¶ 23} We begin with the third assignment of error, which states: "Because the trial court based its findings that Allegheny was not commercially and operationally neutral under the 2012 Substitution Agreement using a factor (high Btu) that was present when the consent was signed, the holding is an error." Gatling argues that under Section 1.2 of the CSA, the provision that authorized the provision of substitute coal, Allegheny was required to assess the commercial and operational neutrality of any substitute coal before agreeing to the substitution. According to Gatling, because Allegheny made no such assessment and failed to insist on any new terms in the 2012 Substitution Agreement that would guarantee commercial and operational neutrality, it breached the CSA when it eventually refused to accept the substitute coal. (Appellant's Brief at 15-17.)

{¶ 24} Gatling's argument essentially posits an interpretation of the CSA that the trial court did not apply. The relevant portion of Section 1.2 of the CSA states:

> Seller may in its discretion, but without obligation, with the prior written approval of Buyer, which approval shall not be unreasonably withheld, furnish all or any part of the coal to be supplied hereunder from other source(s), on the same terms and conditions set forth in this Agreement, and at the same Base Price to Buyer as coal supplied from the Source Mine, provided Buyer is (or is made by payment or adjustment of the Base Price) commercially and operationally neutral to receiving and burning coal from such substitute source rather than from the Source Mine.

{¶ 25} There is no support for Gatling's contention that the language of Section 1.2 requires the Buyer to conduct a commercial and operational neutrality assessment of the substitute coal before agreeing to the substitution. The only express temporal requirement in Section 1.2 states that Buyer must provide "prior written approval" before Seller may

"furnish" the substitute coal. There is no requirement that the question of commercial and operational neutrality be decided before Buyer may approve Seller's request.

{¶ 26} In fact, the overall structure of the parties' agreement indicates that it would be impossible for any definitive determination of neutrality to occur before performance, and that such determination must be made on an ongoing basis. Section 4.2 provides for an independent laboratory analysis of coal shipments, the results of which "shall be used to determine quality adjustments and any rejection or suspension rights." Section 4.3 states that the "total moisture, ash, heating value, sulfur, and volatile matter" of the coal are to be analyzed. Section 7.2 requires a monthly determination of whether "[t]ypical Btu and Sulfur specifications" are met, based on "the data obtained in accordance" with the independent analysis required by Section 4. Based on variations in the data, the Base Price of the coal is adjusted accordingly to a formula that provides "[c]ompensation to either Buyer or Seller for variations in Btu or Sulfur." These provisions indicate the parties' intent to determine the coal's quality through a regular, periodic analysis, which formed the basis for a monthly recalculation of its price. Because these regular price adjustments would be a variable factoring into the assessment of the commercial and operational neutrality of any substitute coal, it would be untenable for Section 1.2 to require the Buyer to perform a blanket assessment of commercial and operational neutrality before agreeing to accept any substitute coal.

{¶ 27} Section 1.2 also states that Buyer may be made commercially and operationally neutral "by payment or adjustment of the Base Price" of the substitute coal. As discussed, such payment or price adjustment depends on monthly sampling of the coal, the results of which determine the price for each shipment. Thus, a monthly assessment of the commercial and operational neutrality of the substitute coal may occur and be resolved by a price adjustment. In addition, the 2012 Substitution Agreement expressly required that any substitute coal must be provided "on the same terms and conditions set forth in" the CSA. This presumably includes the provisions just referenced. For the foregoing reasons, we reject Gatling's assertion that Section 1.2 of the CSA required Allegheny to perform a definitive, binding assessment of the commercial and operational neutrality of any substitute coal prior to agreeing to the substitution. Accordingly, the third assignment of error is overruled.

{¶ 28} The twelfth assignment of error states that "[t]he trial court erred by finding that Allegheny was not commercially and operationally neutral under the 2012 Substitution Agreement." Gatling points out that the CSA did not set any limit on the Btu in coal to be provided because high Btu coal is "more desirable" and a "better product," due to its ability to provide more heat at reduced quantities that are cheaper to transport. (Appellant's Brief at 35.) Thus, Gatling believes that the substitute coal actually benefitted Allegheny, and it was therefore error for the trial court to conclude that the higher-priced substitute coal was not operationally and commercially neutral. According to Gatling, this conclusion was against the manifest weight of the evidence because its expert witness, Walt Coleman, testified that that the substitute coal saved Allegheny money in "sulfur adjustments and operational costs," as well as in transportation costs. (Appellant's Brief at 36-38.)

{¶ 29} Gatling describes the twelfth assignment of error as a "factual error" subject to appellate review under a manifest weight of the evidence standard. (Appellant's Brief at ii & 39.) However, the trial court's interpretation of the CSA, which guided its factual determination, is reviewed under a de novo standard. *Long Beach Assn.* Although we agree with the trial court's ultimate determination that the substitute coal Gatling sought to provide did not render Allegheny commercially and operationally neutral, because we disagree with the trial court's interpretation of the CSA, we must begin with a discussion of that agreement.

{¶ 30} As previously noted, the trial court interpreted the phrase "commercially and operationally neutral" in Section 1.2 of the CSA to mean that Allegheny could not "be placed in a worse position by the acceptance of substitute coal then it would have been by the acceptance of the Source Mine coal." (Final Jgmt. Entry at 10.) The trial court also stated that commercial and operational neutrality required Allegheny to be placed "in the same position it would have been [in] had the CSA been performed as originally intended" after accepting substitute coal. *Id.* Thus, the trial court equated commercial and operational neutrality with Allegheny's expectations for Gatling's performance under the CSA. *See, e.g.*, *Emposimato v. CIFC Acquisition Corp.*, 30 Misc.3d 1233(A), 926 N.Y.S.2d 344, ¶ 12 (Sup.Ct.) (explaining that expectancy damages "are intended to place the party in as good a position as if the contract had been performed"); *Tullett Prebon Fin. Servs. v. BGC Fin., L.P.*, 111 A.D.3d 480, 481, 975 N.Y.S.2d 18, ¶ 2, quoting *Wenger v. Alidad*, 265 A.D.2d 322,

323, 696 N.Y.S.2d 227 (1999) (explaining that " 'breach of contract damages are intended to place a party in the same position as he or she would have been in if the contract had not been breached' ").

{¶ 31} The trial court made the following assessment of the parties' expectations. Under the 2012 Substitution Agreement, the parties agreed that Gatling would "deliver between 400,000 and 500,000 tons" of the substitute coal. (2012 Substitution Agreement.) Because this coal had 13,000 Btu/lb. and the coal described in the CSA was rated at 12,000 Btu/lb., the trial court determined that "[p]ursuant to the 2012 Substitution Agreement, Defendant was required to accept and pay for an additional 880,000,000,000 that it was not required to buy under the CSA, as amended." (Final Jgmt. Entry at 13.) Because Allegheny had to pay for this price differential, the trial court concluded that it was "in a worse position than it would have been if the CSA had been performed as originally intended. Therefore, the 2012 Substitution Agreement did not render Defendant commercially neutral." *Id.*

{¶ 32} The trial court's statements indicate that it understood "commercially and operationally neutral" to prohibit the provision of *any* substitute coal with an elevated Btu value. However, such a prohibition is inconsistent with the parties' expectations because it fails to consider several key provisions in both the CSA and the 2012 Substitution Agreement. The CSA expressly provides for the provision of coal with varying levels of Btu. Section 3.0 lists the "Quality Specifications" for coal and provides that a "typical" specification for "Heating Value (Btu/lb)" is "12,000 min." Thus, the parties contemplated that coal with a 12,000 Btu rating was the general benchmark for a minimally acceptable level of Btu.[1] Section 4.3 requires regular testing of samples from shipments to determine if the "heating value" specification is met. Thus, the parties entered into the CSA fully expecting Btu levels in the coal to vary.

{¶ 33} Crucially, varying Btu levels also affected the parties' expectations regarding the price of the coal. Section 7.2 provides a mathematical formula for determining the actual price of coal after taking into account "variations in Btu." First, a "Base Price" is determined, based on the "Typical Btu" and other specifications. Then, "[u]sing the data

---

[1] Section 3.0 also gives Buyer a right to reject coal with a Btu level of less than 11,500/lb, one of several "Shipment Reject Specifications."

obtained" from the testing in Section 4, a formula for determining the "[c]ompensation to either Buyer or Seller for variations in Btu" results in an "Adjusted Base Price." Read as a whole, these provisions of the CSA indicate the parties' understanding that Btu levels of coal would fluctuate and that the price paid for coal would adjust accordingly. All of these provisions applied to substitute coal, as the 2012 Substitution Agreement expressly states that the "CSA shall continue in full force and effect in accordance with its terms."

{¶ 34} The foregoing observations are not a novel reading of the parties' agreements. We discussed them all in *Gatling I.* We noted that "under the CSA, the default terms for substitution of coal are the 'same terms and conditions' as those that apply to source mine coal, including supplying the substitute coal at the 'same Base Price' as source mine coal, subject to adjustments including those for Btu." *Gatling I* at ¶ 28. We also stated that "the 2012 substitution agreement, read in conjunction with the CSA it incorporates by reference, *plainly reflects the default substitution arrangement to provide coal from other sources at the base price subject to adjustments.*" (Emphasis added.) *Id.* In short, the CSA provided a comprehensive and flexible mechanism for adjusting the price of coal with Btu in excess of 12,000/lb. that was incorporated into the 2012 Substitution Agreement. This reflected the parties' expectation that any coal Gatling might provide, including substitute coal, might surpass the 12,000/lb. Btu level. However, the trial court assumed that all coal provided under the CSA would have a fixed value of 12,000/lb. Btu, which lead it to consider any coal provided under the 2012 Substitution Agreement that surpassed that level as a violation of the commercial and operational neutrality requirement. Because the parties contracted for and expected such fluctuations, the trial court's assumption led to an erroneous understanding of commercial and operational neutrality.

{¶ 35} A more realistic and practical understanding of commercial and operational neutrality must consider the price of the coal, including any adjustment under the CSA, as well as market conditions at the time of its provision. In its briefing, Allegheny counters Gatling's assertion that higher-level Btu is always desirable by stating that this "is not true if the price of those additional Btus, which were not originally contracted for, is more than those additional Btus could be purchased for on the open market." (Appellee's Brief at 28.) Indeed, a Seller cannot charge the Adjusted Base Price for coal with high Btu levels if that price exceeds the fair market value for that coal and comply with the Section 1.2

requirement that the substitute coal render the Buyer commercially and operationally neutral. The provision allows Seller to provide substitute coal "provided Buyer is (or is made by payment or adjustment of the Base Price) commercially and operationally neutral to receiving and burning coal from such substitute source rather than from the Source Mine." (CSA Sec. 1.2.) If the fair market value for coal with the Btu level of the substitute coal exceeds the price calculated according to the formula in the CSA, the transaction can only be commercially neutral to the Buyer if there is "payment or adjustment of the Base Price" to conform to the fair market value. Otherwise, the Buyer is paying a premium to the Seller for coal it could otherwise obtain on the open market at a lower cost.

{¶ 36} With this understanding of commercial and operational neutrality in mind, we turn to the evidence presented by the parties. Gatling points to several points made during the testimony of Walt Coleman, its "expert on commercial and operational neutrality." (Appellant's Brief at 37.) Mr. Coleman testified that the high Btu-level coal saved Allegheny $1.21 per ton in transportation costs, in addition to "the value of the higher Btus" resulting from the increased energy efficiency of the coal. (Appellant's Brief at 37; Oct. 19, 2016 Tr. at 475.) Mr. Coleman also stated that there were savings resulting from sulfur adjustments and disposal costs. (Oct. 19, 2016 Tr. at 491.)

{¶ 37} Allegheny points to the testimony of Michael Delmar, an accountant who previously worked for Allegheny as an economist and buyer in its fuels group. Mr. Delmar testified that Gatling's claimed price under the CSA for the substitute coal resulted in an additional charge of $2.796 million, based on 439,000 tons of coal with an average Btu per pound of 13,030. (Oct. 25-26, 2016 Tr. Vol. V at 911.) Mr. Delmar also testified that Allegheny could have purchased the same amount of coal with additional Btus on the open market for approximately $1.7 million, over $1.2 million less than the price charged by Gatling: "So, had Allegheny been able to go to the market for those extra Btus, it likely could have saved over a million dollars in that coal purchase." (Tr. Vol. V at 913.)

{¶ 38} Considering the testimony cited by each party, we do not believe that the trial court erred in its ultimate finding that the substitute coal failed to render Allegheny commercially and operationally neutral. Mr. Delmar's testimony provides concrete figures to illustrate that Gatling's substitute coal, priced in accordance with the formula in the CSA, resulted in a $1.2 million charge that Allegheny could have avoided by purchasing the coal

on the open market. Providing substitute coal to Allegheny at that price would not render it commercially and operationally neutral.

{¶ 39} Other than the $1.21 per ton in transportation costs, Gatling does not point to any specific dollar amount to quantify the cost savings described by Mr. Coleman. Even if Gatling's substitute coal would have saved Allegheny $1.21 per ton in transportation costs, the resulting savings for 439,000 tons of coal would have been only $531,190. This would not have left Allegheny commercially and operationally neutral because its savings on the open market would have been over twice that amount.

{¶ 40} Based on the foregoing, we conclude that the manifest weight of the evidence in the record supported the trial court's ultimate conclusion that the substitute coal provided by Gatling did not comply with the CSA's requirement of commercial and operational neutrality. Accordingly, Gatling's twelfth assignment of error is overruled.

### D. Gatling's Second, Fifth and Sixth Assignments of Error

{¶ 41} Gatling's second assignment of error states: "The trial court erred by disregarding Allegheny's anticipatory repudiations of the contract." Gatling argues that Allegheny's decision to refuse substitute coal and credit itself for previously paid invoices for substitute coal amounted to "unjustified anticipatory repudiations" of the parties' agreements. (Appellant's Brief at 18.) The fifth and sixth assignments of error assert that the trial court erred by failing to apply Section 7.5 and Section 16.0 of the CSA, which required Allegheny to continue to pay and demonstrate its ability to accept delivery of coal, regardless of any dispute between the parties. (Appellant's Brief at 27.)

{¶ 42} Under the doctrine of anticipatory repudiation, "if one party to a contract repudiates his duties thereunder prior to the time designated for performance and before he has received all of the consideration due him thereunder, such repudiation entitles the nonrepudiating party to claim damages for total breach." *Long Island R.R. Co. v. Northville Industries Corp.*, 41 N.Y.2d 455, 463, 393 N.Y.S.2d 925 (1977).

{¶ 43} Gatling asserts that Allegheny anticipatorily repudiated the CSA when it sent a letter on October 10, 2012, stating that it would not accept any more substitute coal in lieu of coal from the original source or pay Gatling's invoices for the higher Btu coal. (Appellant's Brief at 28.) According to Gatling, these statements amounted to anticipatory repudiation because they were based on "an untenable interpretation of the contract" and expressed an

"intent to perform only upon the satisfaction of extracontractual conditions," definitions set forth in *Fonda v. First Pioneer Farm Credit, ACA*, 86 A.D.3d 693, 694-95, 927 N.Y.S.2d 417 (2011), ¶ 2.

{¶ 44} As our previous discussion illustrates, it was Gatling's interpretation of the CSA that was untenable, not Allegheny's. Gatling's attempt to provide substitute coal at a price higher than the coal would have cost Allegheny on the open market violated the agreement's commercial and operational neutrality requirement. This breach preceded Allegheny's communication, which was a request for Gatling to perform in a manner that would have complied with the CSA's neutrality provision. As such, it was not an anticipatory breach of performance by Allegheny.

{¶ 45} Although the trial court did not discuss either Section 7.5 or Section 16.0 of the CSA in its decision, Gatling was not prejudiced by this failure. Section 7.5 states:

> Any dispute as to the amount of any invoice shall not permit any delay in or deduction from the payment of that, or of any other invoice(s); provided, however, that if it is later determined that any portion of any payment represents overpayment or is otherwise not due to seller, then Seller shall promptly refund to Buyer the amount of such overpayment plain interest thereon, calculated from the date of such overpayment to the date of repayment, at two percent above the rate of interest last publicly announced by Citibank, N.A., as its prime rate as of the date of such overpayment.

{¶ 46} Gatling advances a colorable argument that Allegheny breached the foregoing provision by withholding payment in the amount of $1,644,848.94, rather than paying at the time of dispute (Appellant's Brief at 27.) However, the trial court did award Gatling partial summary judgment in this amount, plus interest, which is the remedy for non-payment specified in the above provision. Thus, the trial court's failure to consider this provision amounts to harmless error.

{¶ 47} Nor did the trial court's failure to apply Section 16.0 prejudice Gatling. Section 16.0 of the CSA states:

> At either party's request, the other party shall continue to demonstrate throughout the Term the availability of, its ability to deliver, or its ability to accept delivery of, coal of the quantity and quality required hereunder. Time is of the essence of this Agreement with respect to the delivery and acceptance of delivery of all mutually agreed upon deliveries.

{¶ 48} Gatling argues that Allegheny's refusal to accept any further substitute coal in its October 10, 2012 letter breached the Section 16.0 requirement to demonstrate "its ability to accept delivery" of coal. (Appellant's Brief at 28.) In the letter, Allegheny stated that "the Btu premium" was a "violation of the commercial neutrality clause" of the CSA, that it would "not accept any further deliveries of substitute coal." Allegheny also stated: "Buyer *will accept* deliveries of Source Mine coal upon receipt of Seller's written confirmation of its ability to deliver Source Mine coal. Once Seller confirms its ability to deliver Source Mine coal, Buyer will submit an appropriate delivery schedule to Seller which will meet the 2012 minimum tonnage requirement." (Emphasis added.) In so stating, Allegheny complied with the Section 16.0 requirement to demonstrate its "ability to accept delivery of, coal of the quantity and quality required" under the CSA because Allegheny was only required to accept substitute coal that rendered it commercially and operationally neutral. Thus, Allegheny did not breach Section 16.0 by refusing to accept delivery of coal that did not conform to the requirements of Section 1.2 of the CSA. Even though the trial court did not apply Section 16.0, Gatling would not have proven that Allegheny failed to comply with it. At most, the trial court's failure to consider either Section 7.5 or Section 16.0 of the CSA amounted to harmless error. For the foregoing reasons, Gatling's second, fifth, and sixth assignments of error are overruled.

## E. Gatling's Seventh Assignment of Error

{¶ 49} Gatling's seventh assignment of error states: "The trial court erred by holding that Plaintiff bore the burden of proof on Allegheny's commercial and operational neutrality defense." Gatling claims that the trial court made a legal error when it placed the burden on it to prove commercial and operational neutrality as an element of its breach of contract claim arising from Allegheny's refusal to accept the substitute coal. Instead, Gatling argues, Allegheny should have had the burden of proof on the issue because it "pled the alleged lack of neutrality as an affirmative defense in its Answer." (Appellant's Brief at 31.)

{¶ 50} Although the parties agreed in Section 11 of the CSA that New York substantive law would govern any dispute between them, the burden of proof raises a procedural question that Ohio law must resolve. *Young v. Frank's Nursery & Crafts, Inc.*, 58 Ohio St.3d 242, 243 (1991), fn. 1, citing *Pennsylvania v. McCann*, 54 Ohio St. 10 (1896)

(holding that the "burden of proof is governed by Ohio law" although another state's substantive law applies to the dispute); *see also White v. Crown Equip. Corp.*, 160 Ohio App.3d 503, 2005-Ohio-1785, ¶ 13 (3d Dist.) (stating that "choice of law provisions apply to determine the application of state substantive law; therefore, while a forum may apply the substantive law of another state, the forum's own procedural law will govern the case").

{¶ 51} There is a well-established "general rule" that, "in civil actions, the obligation of making out a case for relief or remedy by process of court is upon the plaintiff, the mover, the initiator of the action or proceeding. And, speaking generally, the burden of making the necessary proof to warrant the order, finding, or judgment of the court, is upon the party praying for the relief or the remedy." *Martin v. Columbus*, 101 Ohio St. 1, 5 (1920). A more specific rule applicable to pleadings in contract actions states the following:

> Where, in an action upon a contract, it is necessary for the plaintiff to establish the performance of the stipulations on his part in order to recover, the burden of proof is on him, and the burden is not changed by the fact, that the answer, in addition to a denial of performance by the plaintiff, specifically enumerates several particulars in which such failure to perform consists.

*O. F. Mehurin & Son v. Stone*, 37 Ohio St. 49, 54 (1881).

{¶ 52} In a more detailed holding, the Supreme Court of Ohio similarly held:

> When by way of answer to such a petition the defendant in addition to pleading the general denial, further alleges that the services performed by the plaintiff were rendered and performed by him under an express contract the terms of which preclude the recovery of compensation therefor, such averments do not constitute an affirmative defense of new matter requiring a reply, and the filing of a reply thereto does not operate to change or enlarge the issues, or to shift the burden of proof. The legal effect of such an answer taken as a whole, is merely to deny the cause of action asserted by plaintiff in his petition, and the burden of proof upon the issues thus joined rests with the plaintiff, and the court of common pleas did not err in so instructing the jury in the present case.

*Dykeman v. Johnson*, 83 Ohio St. 126, 132 (1910), paragraph two of the syllabus.

{¶ 53} As these holdings illustrate, the form of Allegheny's answer did not alter Gatling's burden of proof. The fact that Allegheny's answer specifically pointed to Gatling's failure to perform in accordance with the CSA's commercial and operational neutrality

requirement did not relieve Gatling of its burden to prove neutrality as part of its breach of contract claim alleging that Allegheny unjustifiably failed to accept the substitute coal. It would be an act of gamesmanship to shift the plaintiff's burden of proof to the defendant simply because a responsive pleading invoked the language of the contract to defend against a claim of breach. Gatling's seventh assignment of error is without merit, and is accordingly overruled.

### F. Gatling's Eleventh Assignment of Error

{¶ 54}  In its eleventh assignment of error, Gatling argues that the trial court erred by failing to award it interest based on the rate agreed to by the parties in Section 7.6 of the CSA. The trial court's ruling stated: "The Court hereby awards partial judgment in Plaintiff's favor in the amount of $1,644,848.94, plus interest at the statutory rate from the date of the filing of this case, plus interest at the statutory rate thereafter." (Final Jgmt. Entry at 22.)

{¶ 55}  Under either New York or Ohio law, the statutory rate of prejudgment interest only applies in a breach of contract action in the absence of a contractual provision stating an agreed rate by the parties. R.C. 1343.03(A) (stating that a prevailing party is entitled to interest on damages at the rate set forth in R.C. 5703.47, "unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract"); *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 258, 928 N.Y.S.2d 666, (June 30, 2011) (stating that "[i]f the parties failed to include a provision in the contract addressing the interest rate that governs after principal is due or in the event of a breach, New York's statutory rate will be applied as the default rate").

{¶ 56}  Here, in Section 7.6 of the CSA, the parties agreed that any "delinquent amount" on an invoice "shall bear interest, from such due date until the date such delinquent amount is paid, at two percent above the rate of interest last publicly announced by Citibank, N.A. as its prime rate as of such due date." Because this provision demonstrates the parties' intent to pay a different rate of interest than the statutory rate, Gatling is entitled to that rate. The trial court erred by disregarding this provision of the CSA. *See, e.g.*, *Ronald J. Solomon, D.D.S., Inc. v. Davisson*, 1st Dist. No. C-170403, 2018-Ohio-2011 (reversing a trial court ruling declining to award interest at the rate agreed to in the parties' contract).

{¶ 57} Allegheny's only response is that Gatling is not entitled to interest because it "is not entitled to any damages. Therefore, it is not entitled to any interest." (Brief of Appellee in Response at 46.) However, Gatling is entitled to damages. As explained below in the discussion of Allegheny's cross-appeal, the trial court did not err in awarding partial judgment in Gatling's favor in the amount of $1,644,848.94. It did, however, err by not awarding Gatling interest at the rate specified in Section 7.6 of the CSA. Accordingly, the eleventh assignment of error is sustained.

### G. Gatling's Eighth, Ninth, Tenth and Thirteenth Assignments of Error

{¶ 58} Gatling's remaining assignments of error concern the trial court's failure to award it damages for Allegheny's refusal to accept the substitute coal and the trial court's finding that no agency relationship existed between Gatling and Foresight. Our resolution of the foregoing assignments of error moots these issues. Because we agree with the trial court that Gatling did not prove its breach of contract claim requiring it to show that the substitute coal rendered Allegheny commercially and operationally neutral, Gatling was not entitled to damages on that claim. The trial court's finding of a lack of an agency relationship between Gatling and Foresight was an alternative basis for ruling that Gatling was not entitled to damages. Even if this ruling were reversed, it would not resuscitate Gatling's claim of breach arising out of Allegheny's refusal to accept additional shipments of substitute coal. Accordingly, assignments of error eight, nine, ten and thirteen are rendered moot.

## IV. ALLEGHENY'S CROSS-APPEAL

{¶ 59} Allegheny has filed a cross appeal challenging the trial court's partial judgment in favor of Gatling that awarded damages in the amount of $1,644,848.94. Allegheny asserts the following assignment of error:

> The trial court committed an error of law by awarding damages to plaintiff despite finding that the plaintiff failed to prove the elements necessary to establish its breach of contract claim.

{¶ 60} Allegheny argues that the trial court erred as a matter of law by awarding damages after determining that Gatling had failed to prove breach, a necessary element of any breach of contract claim. (Cross-Appeal Brief at 25-26.) Allegheny makes two main points to support its argument. First, Allegheny points to the trial court's conclusion that Gatling could not prove breach because it failed to prove that the substitute coal rendered

Allegheny commercially and operationally neutral. (Cross-Appeal Brief at 26-30.) Second, Allegheny argues it was error to award damages because Gatling failed to perform "in strict accordance" with the parties' agreements. (Cross-Appeal Brief at 31-41.) According to Allegheny, Gatling "materially breached the Agreements in at least five ways." (Cross-Appeal Brief at 32.) Gatling's alleged breaches consisted of violating the commercial and operational neutrality requirement; failing to possess title to the coal delivered to Allegheny; attempting to assign its obligations without obtaining Allegheny's written consent; failing to deliver coal after Allegheny withdrew its consent to substitution; and failing to provide adequate assurances of its performance. *Id.*

{¶ 61} There are four "essential elements of a cause of action to recover damages for breach of contract, to wit: the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 69 A.D.3d 802, 893 N.Y.S.2d 237 (2010), ¶ 2. "Damages without such breach cannot be compensated at law." *Godfrey v. Newman*, 135 Misc. 764, 239 N.Y.S. 585, 588 (N.Y.Mun.Ct. 1930) (holding that a plaintiff who "suffered damage" after defendant stockbrokers sold securities from his margin account at a loss "in a wildly fluctuating market" was not entitled to compensation, as there was no breach of contract where the parties' agreement authorized the sale of the securities upon a specified decrease in their market value).

{¶ 62} While we agree with Allegheny's assertion that it would be an error of law for a court to award damages without a plaintiff proving breach, we cannot agree that the trial court committed this error. Gatling stated two causes of action for breach of contract in its complaint. Count I was based on a "Failure to Accept Coal" and Count II was based on a "Failure to Pay Invoices." (Compl. at ¶ 34-50.) The trial court's ruling that Gatling failed to prove breach because it could not prove that the substitute coal rendered Allegheny commercially and operationally neutral applied to Count I, the claim alleging that Allegheny's failure to continue to accept the substitute coal amounted to a breach of contract. However, the trial court expressly stated that the entry of partial judgment and damages was based on Gatling's "claim for charges associated with Btu supplied to Defendant in 2012 *and not paid for*," which describes Count II. (Emphasis added.) (Final Jgmt. Entry at 22.) The distinction between the two theories of breach is also evident in the

trial court's ruling that although Allegheny "was justified in refusing to accept any further Alpha Mine coal, [it] is still required to pay for Btu actually supplied in 2012." *Id.* Thus, the trial court's ruling concerning Gatling's failure to prove operational and commercial neutrality is not applicable to the claim for breach of contract arising from the failure to pay for coal that Allegheny actually accepted.

{¶ 63} The same point may be made with regard to the question of whether Gatling performed in "strict accordance" with the parties' agreements. It is true, as Allegheny points out, that we remanded this case to the trial court to determine "whether Gatling supplied the alternative source coal in 'strict accordance' with the 2012 Substitution Agreement." *Gatling I* at ¶ 30. The phrase "strict accordance" quoted the parties' own language that concluded the 2012 Substitution Agreement: "Allegheny hereby consents to Gatling providing the Alternative Source Coal provided the same is supplied in strict accordance with the above notice." (2012 Substitution Agreement at 2.) The phrase "above notice" referred to the 2012 Substitution Agreement and its new terms concerning the tonnage of coal, its source mine, and place of delivery.

{¶ 64} The "material breaches" that Allegheny identifies are an unjustifiable extension of the scope of our mandate, which was not a license for Allegheny to pursue counterclaims for breaches of any provision of the CSA referenced by the trial court that it never plead at the outset of this litigation. However, that is effectively what Allegheny is now attempting. Furthermore, not one of the points raised by Allegheny addresses the breach identified by the trial court as the basis for its award of damages: Allegheny's failure to pay for coal that Gatling provided. Without any explanation of how the trial court erred in determining that its failure to pay Gatling $1,644,848.94 amounted to a breach for which Gatling was entitled to a remedy, Allegheny's assignment of error must be overruled.[2]

## V. CONCLUSION

{¶ 65} All of Gatling's assignments of error are overruled or mooted, with the exception of the eleventh assignment of error, which is sustained. Allegheny's sole assignment of error in its cross-appeal is overruled. We reverse and remand solely so that trial court may apply the contractually agreed upon rate of interest to Gatling's damages

---

[2] Allegheny makes no argument concerning whether the manifest weight of the evidence supported the amount of damages calculated by the trial court. Allegheny's brief explicitly states that the error it asserts is "purely a question of law." (Cross-Appellant's Brief at 24.)

award. In all other respects, the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed in part and reversed in part; cause remanded.*

BROWN, P.J. and DORRIAN, J., concur.

_____